NOTICE
Decision filed 11/09/22. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2022 IL App (5th) 190525

NO. 5-19-0525

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of |
| Plaintiff-Appellee, | ) ) | Union County. |
| v. | ) ) | No. 19-CF-39 |
| WILLIAM P. WASMUND, | ) ) ) | Honorable Stephen R. Green, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE MOORE delivered the judgment of the court, with opinion.
Justices Welch and Wharton concurred in the judgment and opinion.

**OPINION**

¶ 1    In this direct appeal, the defendant, William P. Wasmund, challenges his conviction after a trial by jury in the circuit court of Union County. For the following reasons, we affirm.

¶ 2                                    I. BACKGROUND

¶ 3    The facts necessary to our disposition of this appeal are as follows. On February 5, 2019, the defendant was charged, by information, with one count of first degree murder. The count charged that, on or about September 16, 2018, the defendant

   "knowingly, without lawful justification, placed a shotgun attached to a table with the

   trigger set to the the [*sic*] shed door to fire when the door to the shed opened *** and the

   shotgun was aimed at the door of the shed knowing such act created a strong probability

1

of death to any person opening the door of the shed, thereby causing the death of Jeffery A. Spicer, in violation of Illinois Compiled Statutes Chapter 720, Act 5, Section 9-1(a)(2)."

¶ 4    On February 7, 2019, the defendant made his first appearance before the circuit court where he was informed of the charges against him. During the first appearance, the circuit court, *inter alia*, also informed the defendant that he would "have the right to testify on your own behalf if you chose to do so after talking with your attorney and after being advised fully by the Court on that issue." A superseding bill of indictment was filed on May 7, 2019. In that document, the defendant was charged again with the same first degree murder charge, but additionally charged with aggravated battery and reckless conduct. On July 1, 2019, the State filed a motion to nol-pros count III, the reckless conduct charge. The court granted the motion, and the charge was withdrawn. Therefore, only the first degree murder charge and the aggravated battery charge proceeded to trial.

¶ 5    The State also filed on July 1, 2019, a motion *in limine* to prohibit the defendant from introducing evidence or argument relating to his affirmative defense of justifiable use of force in defense of other property filed. After hearing on the matter, the trial court denied the motion.

¶ 6    The four-day jury trial began on September 9, 2019. On that day, *voir dire* was conducted. After an initial welcoming and swearing of the prospective juror pool, four potential jurors were selected for questioning, and the remaining jurors were excused to another room. Following this, the defendant's counsel approached the bench and asked the trial court if parties from both sides could sit in and observe the *voir dire* process. The trial court confirmed that neither party had an objection, and it was allowed. The court and attorneys for the parties then conducted *voir dire* with eight individuals. After finishing the questioning as to those jurors, the trial court noted on the record that "present in the courtroom were several individuals who were wearing shirts that apparently were sympathetic to the alleged victim in this case. There was a message on the front

2

and a potential message on the back." The trial court went on to note that, after balancing the rights of the citizens and the rights of the defendant, it had decided that those individuals would not be allowed in the courtroom with that attire and that they could return only when wearing clothes that did not risk communicating potentially partisan messaging to the jurors. The trial court indicated this would be the case for the entirety of the trial proceedings. He then instructed the bailiffs as to his ruling and to prevent this from occurring again. The trial court and parties then finished *voir dire* and empaneled the jury.

¶ 7 On September 10, 2019, day two of the trial commenced. The parties presented opening arguments, and the State started its case-in-chief. The State called its first witness, Jason Stegle, to the stand to testify. Mr. Stegle testified that he was a neighbor of the defendant. On the morning of September 16, 2018, he observed a truck, which he did not recognize, with its driver-side door open parked at the defendant's property. He noticed something that appeared to be a bag or possibly a person lying down near the truck. After stopping and approaching the truck, he realized the object was a person who appeared deceased. Mr. Stegle testified that he returned home to phone the police and then returned to the property where he remained until Officer Josh Schildknecht arrived.

¶ 8 Mr. Stegle testified that he was familiar with the defendant's property both as his neighbor and as a volunteer firefighter, who had responded to the defendant's home twice before this incident due to fire calls. He authenticated a number of photographic exhibits depicting the defendant's property for the State. He also testified that the defendant's home had caught fire and been "burned out," and that on September 16, 2018, no one was living there.

¶ 9 Following Mr. Stegle's testimony, a break was taken. During that break, the trial court was informed that crime scene photographs, depicting the alleged victim's body and blood, were going to be shown to the next witness. The trial court then asked the parties' attorneys, "Well, if you

guys don't object, I'd like to say something briefly about the nature of the photographs—*** if anyone wants to leave. I'd rather not have an outburst." Both attorneys indicated they had no objection, and the jury and those present to watch the trial were warned by the court that some photographs that were going to be shown would be "sensitive and graphic in nature." The court then stated that those who might have difficulty maintaining their composure could step outside the courtroom and they would be notified when they could return after the images were finished.

¶ 10    The State next called Officer Josh Schildknecht. Officer Schildknecht testified that he was a deputy with the Union County Sheriff's Department who, on September 16, 2018, responded to Mr. Stegle's 9-1-1 call. Upon his arrival at the defendant's property, he discovered the alleged victim and Mr. Stegle.

¶ 11    The State's questioning then turned to Officer Schildknecht's observations of the body of the alleged victim and the crime scene. As a result, prior to revealing the photographs of the alleged victim's body, the state's attorney warned, "And just for warning, further warning, Your Honor." Officer Schildknecht then testified that upon his arrival the individual lying on the ground was deceased. He testified that he called dispatch and asked for the sheriff to be notified of a deceased person, along with a detective and the Illinois State Crime Scene department. An unnamed individual also stopped by and identified the alleged victim, Jeffery Spicer. Further, the defendant came to the scene as well.

¶ 12    In response to his calls, Detective Bart Hileman and crime scene investigator Jason Craddock came to the scene. Officer Schildknecht testified that the investigators determined that Mr. Spicer did not die of suicide because no weapon or gun was found near his deceased body. Further, they discovered a blood trail that led from Mr. Spicer to a shed located on the property. Officer Schildknecht testified that once he observed the shed, he noticed that the door was "slightly ajar" and that the metal hasp on it was broken or shattered and there was blood on it. He believed

4

that the shed had been broken into because the hasp and lock were broken and a hammer was located nearby outside the shed. However, he admitted that was an assumption on his part. Inside the shed appeared to be some type of booby trap. As a result, the Southern Illinois University and Secretary of State Police bomb squads also came to the property to clear the area.

¶ 13   The jury was then shown State's exhibit 3, an eight-minute video taken from Officer Schildknecht's body camera from that day. In the video, the defendant was being questioned by various law enforcement officers and investigators. The defendant stated that he had not been to the property since August 2018. He then asked if the deceased individual had been struck by a vehicle. The defendant indicated that his property was in foreclosure since it had caught fire and that he had been having issues with people stealing the property he left there. When asked what had been stolen, the defendant responded, "Well, everything that I had that survived the fire." When asked if any guns had been left at his property or stolen, he responded that he could not remember, "Just had some clothes, some tools, couple sets of speakers." The officers then asked for permission to search the property, which defendant granted. He added that "the shed's all locked up, doors are screwed shut and everything else, so getting in there will be a hell of a task."

¶ 14   After finishing the video, Officer Schildknecht testified that the defendant made this statement prior to them viewing the shed or the booby trap. He testified that the door to the shed did have a warning sign, indicating that you should not enter. He also recalled that some type of knife was discovered underneath the body of Mr. Spicer.

¶ 15   On redirect, Officer Schildknecht testified that when he approached the shed and looked in, he could see the spring gun and a rope that had been attached to the shed door, which ran along the ceiling to a shotgun pointed towards the door. He could not tell if the spring gun was loaded and still active, so the bomb squad was called in to diffuse any active hazards and make sure everything was safe prior to anyone entering the shed.

5

¶ 16    The State next called Jason Craddock. Investigator Craddock testified that he is a crime scene investigator with the Illinois State Police and worked the scene at the defendant's property on September 16, 2018. He testified as to his credentials, experience, and duties as a crime scene investigator. He testified that he took photographs of the alleged victim and the scene during his investigation and authenticated those photographs on the stand. The photographs he took depicted Mr. Spicer's body, his injuries, and the blood-stained areas near his body. Additional photographs showed glass smoking devices commonly used with "methamphetamine or some other kind of inhalant." One of the glass pipes that he photographed appeared to contain residue from methamphetamine or another illegal substance which had been smoked in it. Other photographs showed various objects discovered, such as a hammer with what appeared to be blood on the handle that had been found in taller grass near the shed.

¶ 17    Investigator Craddock was then questioned regarding photographs that showed the shed and various parts of the spring gun and booby trap. He testified that after the bomb squads cleared the shed, he entered it. He saw a shotgun on the ground. He saw where a rope was attached to the front door and then strung back to the gun where the other end was tied onto the trigger. He also noted that there was another door to the shed, but it was secured closed with screws, and it was never opened. He testified to photographs that depicted the broken hasp and padlock, which had secured the shed door, but which was now slightly ajar. He testified that there were defects in the shed door that suggested to him the door had been struck by a shotgun blast.

¶ 18    He testified that, based upon the evidence he saw, it was apparent that the shotgun had been placed in a vise located on a table so that it was pointed directly towards the door. The rope was attached to the gun's trigger, which would cause the gun to fire towards the door if it was opened.

¶ 19    On cross-examination, investigator Craddock testified that a pocketknife, flashlight, rachet, rachet extension, and socket wrench were found near Mr. Spicer or on his person. He turned these

items over to Detective Bart Hileman and was not aware as to whether any of the objects were tested for DNA evidence. He was also unaware as to any testing completed on any of the other areas of the crime scene or objects discovered. He did note that the Union County Sheriff's Department did take control of the entire shed and its contents.

¶ 20 On redirect examination, investigator Craddock testified that based upon the scene and the evidence observed, specifically the blood evidence, "we definitely believed at that time that the victim had forced that door open *** or at least had opened the door. I don't know that he had forced the lock and stuff itself, but at least had opened the door." He testified that circumstantial evidence made it apparent that Mr. Spicer was shot with the spring gun that was in the vise aimed at the shed door and set to fire when someone opened that door.

¶ 21 The next witness called by the State was Dr. James M. Jacobi. Dr. Jacobi was the forensic pathologist assigned to Mr. Spicer's case. He testified to his background, training, and certifications. He then testified as to the autopsy that he conducted of Mr. Spicer, including the injuries Mr. Spicer sustained that led to his death. He ultimately gave his opinion that Mr. Spicer died of exsanguination or blood loss. The blood loss was caused by two metal plate fragments that entered his right arm and forearm. He testified that these were not the actual shotgun pellets, but metal shrapnel that were forced forward from the blast, which entered Mr. Spicer's body in conjunction with the shotgun pellets. Dr. Jacobi also testified that the toxicology report showed that Mr. Spicer had methamphetamine and amphetamine in his system at the time of his death.

¶ 22 Following Dr. Jacobi's testimony, the jurors were allowed to view the actual shed where the incident occurred, which had been taken from the defendant's property and was in police custody as evidence.

¶ 23 On the third day of trial, September 11, 2019, the State called Detective Bart Hileman. Detective Hileman testified that he worked for the Union County Sheriff's Department and was

the lead detective on the Jeffery Spicer death. He testified that he was called out to the defendant's property on the day the body was discovered.

¶ 24 He testified that, while at the scene, he spoke with the defendant and his girlfriend, Samantha Johnson. During his first conversation with the defendant and Johnson that day, he did not yet know about the shed and the booby trap; he was only aware of the deceased victim. He testified that the defendant gave permission to law enforcement to search both the burned-out home and the shed, but that the defendant indicated the shed was locked. When asked if there was a key they could use to gain access to the shed, the defendant pulled out his key ring, which had two keys on it that would go into a padlock like the one on the shed and gave him one of the keys. However, that key did not work.

¶ 25 On the second interaction, he had learned of the booby trap, so he inquired of the defendant as to whether any other traps or dangerous conditions existed that could injure someone. The defendant indicated there were not.

¶ 26 Detective Hileman testified that, as a part of his investigation, he interviewed the defendant formally for the first time on September 20, 2018. That interview was then played for the jury without objection.

¶ 27 The video depicts the defendant and two detectives, Hileman and Liggett, in an interview room. The defendant states that he knew of Mr. Spicer, but that they were not close. He confirmed that his house had caught fire and burned and that he had not resided at the property since sometime in 2016. He told the investigators that August 5, 2018, was the last time he was at the property before the body was found and that no one else had permission to be on his property. He stated that "there ain't nothing there to keep an eye on" and "there ain't nothing left there to steal." He then said that he had caught Bill Chapman stealing from him before on different occasions. And that he had been to the property

8

"and the locks was cut off my shed and everything was gone and they had a few things left just piled up out in the yard and I was like they are going to be back I'm going to catch whoever this is and I just hung out there. And when I saw it was Bill it just broke my heart."

¶ 28 He told the investigators that he had taken steps to stop the stealing, put up a table in the driveway and put up no trespassing signs. After he caught Bill Chapman stealing, he even put razor blades on the shed door and dug a deep hole in front of the shed. A police officer told him that he could not have stuff like that around his shed so he covered up the hole he dug. When asked why he would put up the razor blades and dig the hole, he responded, "get a good laugh when they broke their ankles and sliced their hands."

¶ 29 He stated that he had left a shotgun in the shed, "[I]t's been in there since, you guys arrested me over stuff with you guys, and I had some guns in the trunk of my car." He admitted that the gun used was his and noted that "sure in the hell wasn't nothing down there worth somebody's life." The officers then discussed a rift between him and a man, James Clover. They then asked him if there was anybody out to get him. He denied that he knew of anyone. He stated that the last time he saw the shotgun it was laid out on a table and that "somebody had to take it up and load it and point it at [Mr. Spicer]."

¶ 30 The officers then asked the defendant about the key to the shed he gave them that did not work. They inquired as to what the other key on his keyring was for and he stated that it went to his buddy's shed. They asked if he had that key still on him and he said that he did not have it with him. He then went on to say, "I haven't even attempted to open [the shed] in a year." He explained that when he was there in August he did not go in the shed. After stating that, one of the officers responded that, "If you haven't been in that shed in a year and haven't touched that gun in a year, they may not find your DNA." Prior to ending the interview, the defendant again denied setting any traps and stated, "There wasn't nothing down there to protect."

¶ 31    Following the presentation of the first interview of the defendant, direct examination of Detective Bart Hileman continued. He testified that he took DNA samples from the defendant and reiterated that the gun in the shed was the defendant's gun.

¶ 32    He testified that after the September 20 interview with the defendant, he received information that Roger Ellet had information regarding a spring gun that had been set up in a shed. As a result, he interviewed Mr. Ellet on January 16, 2019. He testified that he then interviewed several individuals, including Tim Sumner, Rocky Goodman, Mike Ellet, and Mr. Ellet's wife, who corroborated Mr. Ellet's story.

¶ 33    Detective Hileman then testified that as a part of his job, he was not only in charge of coordinating the investigation but reviewing and staying up to date on interviews and evidence gathered on the case. He testified that before he spoke with Mr. Ellet and the other individuals, he did not release any information to the public regarding the manner of Mr. Spicer's death. As a result of the information received from Mr. Ellet, Detective Hileman brought the defendant back for additional questioning on January 24, 2019.

¶ 34    Then the defendant's January 24, 2019, interview was played for the jury without objection. Again, the defendant was being interviewed by Detectives Hileman and Liggett.

¶ 35    The interview begins with the detectives informing the defendant that his shed has been taken from his property and placed into evidence. The detectives then confront the defendant with their theory that they believe the defendant set up the booby trap because the defendant wanted to "pepper Bill Chapman's a**, because he was stealing from you." The defendant responded to that allegation with, "I want to beat Bill Chapman's a**, but I have no desire to kill anyone." The defendant continued to deny any knowledge about the trap and denied setting it up. The defendant stated, "[A]in't nothing in that shed that needs protecting." He then claimed that he believed the trap was set up to kill him. He stated that he was in his shed twice that year and that he and Roger

Ellet had "went down there and moved some s*** out." When asked about that event with Mr. Ellet, the defendant stated that he and Mr. Ellet were not really friends, "but he had a truck and I paid him to help me move some s***," and indicated that the things moved included "some speakers and an old stereo." He informed them that he and Mr. Ellet moved his things out of the shed around December 2017 or January 2018. The defendant stated that he was living with Tim Sumner, who was a mutual friend of his and Mr. Ellet's when he asked Mr. Ellet to help him move.

¶ 36 The detectives again reiterated their theory that he may have been trying to get Bill Chapman. The defendant then responded that "[Mr. Ellet] is a poster boy for the opioid epidemic," and "besides that he's a doped-up idiot who doesn't like me."

¶ 37 Detective Liggett then attempted to explain to the defendant how Mr. Spicer was killed by the booby trap. Detective Liggett used the analogy of an explosion to help illustrate what happened. He explained that the gun fired, and it contained bird shot so it ejected metal pellets. However, the force of the bird shot projectiles hit the shed door and broke loose an aluminum gusset. The fragments of that gusset then penetrated Mr. Spicer's arm and struck an artery causing him to bleed to death. He then acknowledged that the defendant was wearing a military style jacket and asked him if he knew what a claymore was. Detective Liggett then explained that this was similar to a claymore or I.E.D. (improvised explosive device) that is used over in the wars in the Middle East to injure United States soldiers.

¶ 38 The detectives then informed the defendant that Mr. Ellet told them that the rope used in the booby trap was the same rope that the defendant and Mr. Ellet used to tie down the stuff they loaded up in his truck on that day at the defendant's property. The defendant continued to deny any involvement.

¶ 39 Following the presentation of the January 24, 2019, interview, the direct examination of Detective Hileman resumed. Detective Hileman testified that a few hours following the January

24 interview, the defendant texted him on his phone. Detective Hileman testified that in the text message the defendant stated that the story Mr. Ellet told them could not be true because, at the time he and Mr. Ellet went to his shed to get his property, the Jackson County Sheriff's Office had custody of his shotgun. There was no way he could have set it up while they were there together because the shotgun was not in his possession. Following this, Detective Hileman looked into what the defendant had said and discovered that the gun was in police custody from January 20, 2018, to January 22, 2018. This was stipulated to by the parties and placed into evidence as State's Exhibit 9. Then Detective Hileman testified that the defendant had also texted him and told him that the defendant had received a speeding ticket the day before he and Ellet went to his shed. Detective Hileman looked up the speeding ticket which occurred on December 21, 2017, which would make the day he and Mr. Ellet went to the shed December 22, 2017. However, Detective Hileman testified that the dates provided to him by the defendant as to these events did not match the dates above.

¶ 40    Detective Hileman then testified that they attempted to arrest the defendant on February 5, 2019. He stated that he and Detective Liggett drove to the defendant's residence in Chester, Illinois. They arrived at the home around 7:30 or 8 p.m. They learned that the defendant was at work from the defendant's girlfriend Samantha Johnson, who was home and was on her cell phone when they began speaking. The detectives then went to the defendant's place of work, where they also could not locate him. Later, a police officer in Steeleville found the truck that the defendant was assigned to drive in a parking lot with the door open, engine still running, and lunch box still inside the truck. However, the defendant was not present. Following that, the detectives put out a dispatch to Jackson and Union County police officers to be on the lookout for the defendant's vehicle. They ultimately found the vehicle in the back yard of the defendant's parents' home in Grand Tower. Upon his arrival, Detective Hileman testified that he noticed skid marks leading to

12

the vehicle and broken plastic bits from the vehicle where it appeared the vehicle had struck something and then come to a "hurried" stop. However, the defendant was no longer at his parents' home when Detective Hileman arrived. Instead, only the defendant's stepfather was home. Later on, he received information that the defendant's mother was driving the defendant home and so they followed that lead. However, they did not locate the defendant until he turned himself in to the Chester Police Department sometime between 6 and 7 a.m.

¶ 41 Detective Hileman testified that after the defendant turned himself in the morning of February 6, 2019, he and Detective Liggett questioned him further. The State then presented the video of the interview to the jury and entered it into evidence as State's exhibit 11 over the relevance objection of the defendant.

¶ 42 During the questioning, the defendant was informed of the charges against him, including first degree murder. After, Officer Hileman expressed his displeasure in the difficulty they had locating the defendant the night before. The defendant responded that he turned himself in. Officer Liggett stated that he was also "disappointed" and stated that the defendant turned himself in "about 12 hours too late." He told the defendant that he was at his house at 7:30 p.m. and "your girlfriend was on the phone with you when we were on the steps." He then went on to summarize the events of the evening prior and their attempts at arresting the defendant, which was consistent with that testified to by Detective Hileman. Detective Liggett expressed his unhappiness that the defendant involved the defendant's mother, who has a heart condition, in the ordeal. The defendant reiterated that this was a "big mistake" and that he did not have anything to do with the spring gun trap.

¶ 43 Following the video, direct examination again resumed. Detective Hileman testified that the defendant told him that at one time he had Bill Chapman in the crosshairs of a crossbow while Bill was stealing his property, but he could not pull the trigger.

¶ 44    On cross-examination, Detective Hileman testified that, during the interviews, the defendant stated that he had locks on his shed that had all been cut off prior to this incident. He testified that, based upon the evidence he saw, he believed Mr. Spicer was at the defendant's property that evening to steal property.

¶ 45    On redirect examination by the State, Detective Hileman stated that despite the defendant being cooperative, the defendant had two keys on a key ring with him when he was first questioned at the scene. He gave one key to them, which he said went to the shed. He did not turn over the other key and said it went to his friend's shed. However, the key he turned over to them did not work. During the second questioning at the scene, the defendant was informed that the gun in the shed had been fired. Detective Hileman testified that after the defendant learned that fact, he was willing to go into the shed and did not appear concerned about any other potential booby traps on the property. He then testified that the defendant had reported to them previously being shot at on his property but, after investigating the claims, found them not credible.

¶ 46    The final witness called to the stand by the State was Roger Ellet. Mr. Ellet testified that the defendant was living with his friend, Tim Sumner, when he and the defendant became reacquainted. Mr. Ellet had been moving property for Tim Sumner with his pickup truck, and Mr. Sumner asked Mr. Ellet if he would move some things for the defendant. Mr. Ellet testified that he did not really want to help the defendant, but that Mr. Sumner told him that he would pay him to help the defendant.

¶ 47    He testified that sometime in late February or early March of 2018, he helped move the defendant's things. They met at Mr. Sumner's house and drove to the defendant's property in his truck. He did not observe the defendant put anything into his truck before they left. Once they arrived at the defendant's property, the defendant showed him the things he wanted to move that were located around the outside of his shed and "under a lean-to." The defendant then went into

14

the shed as Mr. Ellet loaded up the truck. Once everything was loaded, the defendant came out of the shed, and the two got into Mr. Ellet's truck to leave. Mr. Ellet testified that he was irritated because the defendant did not help him much, so he asked the defendant why he did not help. The defendant responded that "he was setting up this deal in the shed and he was going to scare Bill Chapman." Mr. Ellet then explained that the "deal" was a spring gun in the shed. He testified that he did not feel comfortable with that being set up and expressed this concern to the defendant. The defendant then assured him that the gun was not loaded and was just set up to "scare" Bill Chapman. After they were finished moving the things, the defendant again assured him the gun was not loaded.

¶ 48    Mr. Ellet testified that he told his wife about the incident and then did not "go back around" Mr. Sumner or the defendant after that. He stated that he also told his brother and brother-in-law about it. He testified that he did not inform law enforcement because he did not know it was illegal to set up a spring gun. He denied seeing a gun on the day he helped move the defendant. He testified that they were at the defendant's property for probably 45 minutes to an hour. He testified that he never saw him attach a rope to the door.

¶ 49    Mr. Ellet then identified the rope marked as State's exhibit 5, which was the rope used in the spring gun trap. Mr. Ellet identified it as his rope that he had gotten from his job at the coal mine. He testified that he used the rope to tie things down when he helped Mr. Sumner move and that he kept it in the back of his truck. He testified that he never gave the rope to the defendant, but that he did notice it missing following the day he helped the defendant move. He believed that the defendant took it out of his truck when he was loading things up at the defendant's property.

¶ 50    On cross-examination, Mr. Ellet testified that he recalled being interviewed by Detective Hileman on January 16, 2019. He testified that during questioning he identified the rope as his. He denied saying in his videotaped interview that he saw the defendant take the rope out of a duffel

15

bag. He denied not being able to describe the rope's length or detail but testified that he could recognize the rope. He denied ever being shown the actual rope during the interview, only photos of the rope. He testified that he did not recall going into the shed when he helped the defendant move his property. He denied stating during the interview that he saw the defendant take a gun out of a duffel bag. He testified that he could not remember calling the defendant "a liar," a "son-of-a-b***," "intimidating," or "his enemy." He then clarified that he may have, but just did not remember, and said that "as far as I'm concerned, you know, we've never really been enemies. I don't know why all that—you know, I would have said that." The State then rested its case.

¶ 51    On the fourth day of trial, September 12, 2019, the defense put on its evidence. The defendant did not testify. The defense offered, by agreement of the parties, the January 16, 2019, videotaped interview of Roger Ellet as evidence, Defendant's exhibit 1. The video was then played for the jurors.

¶ 52    In the January 16 interview, Mr. Ellet expressed his sympathies regarding Mr. Spicer's death. He indicated that he did not know Mr. Spicer well, but that his sister worked for Mr. Spicer's mother. Mr. Ellet told the detectives that around March 2019 the defendant set up the booby trap. Mr. Ellet stated that the defendant tries to bully people around, that he does not have a conscience, and that he is a "smart a***" who tries to be intimidating. Mr. Sumner and the defendant were living together. Mr. Sumner asked Mr. Ellet to help the defendant and offered to pay him. He stated that while he was helping Mr. Sumner, the defendant was always telling them about people stealing from his property.

¶ 53    On the day he helped the defendant move, the defendant pulled out a duffel bag from Mr. Ellet's truck once they were at the defendant's property. He assumed that the defendant got a duffel bag out of his car at Mr. Sumner's house and put it in his truck before they left. While at the property, the defendant told Mr. Ellet that Bill Chapman had been stealing from him. The

defendant did not help him load, but "was back there tinkering around." After he finished up tying things down on the truck, he asked the defendant what was taking him so long in the shed. The defendant then started laughing and told Mr. Ellet that he put a gun in a vise and ran a cable to the door so that if somebody opens the door they are going to get killed. The defendant told him that he was going to kill Bill Chapman because "that son of a b*** been breaking into my house. And I'm going to kill that son of a b***." He then told the detectives that he and the defendant argued about the spring gun, and he told the defendant that he has nephews that rabbit hunt down there and could get hurt, or other people. The defendant then responded that they did not have a right to be on his property. Then the defendant told him that the gun was not loaded, but Mr. Ellet did not believe the defendant.

¶ 54    The detectives then asked Mr. Ellet what Mr. Ellet actually saw the defendant do while he was there. Mr. Ellet responded that he saw him tinkering in the back and get some stuff out of the duffle bag. He then said, "I think I vaguely seen it when he got it out of the bag," apparently referring to the shotgun.

¶ 55    Detective Hileman then informed Mr. Ellet that to "be honest when I came to talk to you, you were a suspect. We were told you set it up for [the defendant]." Mr. Ellet then spoke about Mr. Sumner and the defendant trying to blame him for setting up the spring gun.

¶ 56    There was also discussion regarding the rope used in the booby trap. When asked if he recognized a picture of the rope used, Mr. Ellet stated that it looked like rope that Mr. Sumner had at his house that they used to tie down stuff they were moving. He then indicated that he also had rope like that but stated that they did not use his rope, so he thought it was Mr. Sumner's rope.

¶ 57    Detective Hileman then noted to Mr. Ellet that he and the defendant had "locked horns before" on a case where there was an altercation with another man over the defendant's ex-wife and as a result of incidents between the defendant and Bill Chapman. Mr. Ellet then mentioned

some rumors that he had heard regarding the defendant, including that his truck was destroyed by fire, and it involved methamphetamine; that the defendant was accused of arson with the burning of his house; and that the defendant had been arrested in Murphysboro with a loaded gun. The interview then ended with Mr. Ellet giving a voluntary DNA sample for testing and stating that he did not handle the defendant's gun that day. The defense then rested its case.

¶ 58     Sandra Ellet was then called by the State in rebuttal. Sandra is the wife of Roger Ellet. She testified that Mr. Ellet told her that the defendant set up a booby trap at the defendant's property. She testified that he told her this in February or March of 2019.

¶ 59     Robert Goodman was also called. He is Mr. Ellet's brother-in-law. He testified that Roger told him sometime close to the date of Mr. Spicer's funeral that the defendant had set up a booby trap on his property.

¶ 60     Later that afternoon, the parties gave their closing arguments. Following deliberations on that same day, the jury found the defendant guilty of both charges of first degree murder and aggravated assault. On October 11, 2019, the defendant filed for a motion for judgment of acquittal notwithstanding the verdict. That same day, the defendant also filed another posttrial motion requesting the vacating of the judgment and acquittal or the granting of a new trial. On December 6, 2019, a hearing was held on the defendant's motions. The trial court denied the defendant's posttrial motions. On December 16, 2019, a sentencing hearing was held and the defendant was sentenced to 30 years in the Illinois Department of Corrections on the conviction of first degree murder. This timely appeal followed. Additional facts are articulated below where necessary.

¶ 61                              II. ANALYSIS

¶ 62     On appeal, the defendant argues the following errors occurred during his trial: (1) the State failed to prove beyond a reasonable doubt that the defendant was not justified in the force that he used to protect his shed from a burglary, (2) the State, in rebuttal closing argument, improperly

18

shifted the burden of proof to the defendant and misstated the law, (3) the defendant was deprived of his right to a fair trial because the jury was presented with numerous pieces of improper and prejudicial evidence, (4) the defendant was provided ineffective assistance of counsel, and (5) the trial court failed to admonish the defendant of his fundamental right to testify in his own defense at trial, and his waiver of this right was not recorded on the record. As a result of one or more of these errors, the defendant asks this court to either reverse his convictions or grant him a new trial.

¶ 63                    A. The State Failed to Meet Its Burden of Proof

¶ 64    The defendant's first contention on appeal is that the State failed to prove beyond a reasonable doubt that the defendant was not justified in using deadly force to protect his shed with a spring gun. The defendant on appeal only attacks the sufficiency of the evidence put forth by the State as it relates to the defendant's affirmative defense. Although the State also bears the burden of proving beyond a reasonable doubt that the defendant actually set up the spring gun, the defendant on appeal does not challenge in his argument the sufficiency as to the State's proof that he set up the spring gun.

¶ 65    Due process protects defendants from conviction unless the State can prove beyond a reasonable doubt every fact necessary to constitute the charged crime. *In re Winship*, 397 U.S. 358, 364 (1970); U.S. Const. amends. V, XIV; Ill. Const. 1970, art. I, § 2. Once a defendant has been found guilty, the fact finder's role as weigher of evidence is preserved by directing judicial review of the evidence in the light most favorable to the prosecution. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). The discretion of the jury is only impinged to the extent necessary to guarantee the fundamental protection of due process of law. *Id.* Further, a reviewing court will not substitute its judgment for that of the trier of fact on issues of the weight of evidence or the credibility of witnesses. *People v. Thomas*, 178 Ill. 2d 215, 232 (1997). A reviewing court should reverse a conviction only if it is so unreasonable, improbable, or unsatisfactory as to justify a reasonable

19

doubt of guilt. *People v. Ash*, 102 Ill. 2d 485, 492-93 (1984). The relevant standard of review when an affirmative defense such as the one in this case is involved is whether, after considering the evidence in the light most favorable to the State, any rational trier of fact could have found, beyond a reasonable doubt, that the defendant did not act in defense of property. See *People v. Lee*, 213 Ill. 2d 218, 225 (2004).

¶ 66    The statute at issue in this case reads as follows:

"A person is justified in the use of force against another when and to the extent that he reasonably believes that such conduct is necessary to prevent or terminate such other's trespass on or other tortious or criminal interference with either real property (other than a dwelling) or personal property, lawfully in his possession or in the possession of another who is a member of his immediate family or household or of a person whose property he has a legal duty to protect. *However, he is justified in the use of force which is intended or likely to cause death or great bodily harm only if he reasonably believes that such force is necessary to prevent the commission of a forcible felony*." (Emphasis added.) 720 ILCS 5/7-3(a) (West 2018).

Thus, the question before us is whether the State presented sufficient evidence for a rational jury to find beyond a reasonable doubt that it was unreasonable to believe that the only way to prevent the defendant's shed from being burglarized was to set up an illegal spring gun trap. We find that sufficient evidence exists.

¶ 67    First, we note that the facts of this case, especially as it relates to the interpretation of this particular section of Illinois statute, appear to present a question of first impression in Illinois. The defense argues that the evidence at trial established that Mr. Spicer was on the defendant's property unlawfully and attempted to commit a forcible felony, burglary. Mr. Spicer was there in the early hours, had methamphetamine in his system, and was equipped with "burglary tools." Further, the

20

shed door had been opened, the hasp on the door broken, and the nails had been taken out of the door. Detective Hileman and Investigator Craddock both testified that it appeared Mr. Spicer was likely at the property attempting to break into the shed. Further, neither party argues that a burglary does not constitute a forcible felony. Thus, we move forward with our analysis with the assumption that Mr. Spicer was, in fact, attempting to commit burglary by entering the shed, although arguments could be made to the contrary.

¶ 68    We turn to the question of whether it was "reasonable" for the defendant to believe deadly force was necessary to prevent the burglary of the shed. We complete this analysis, viewing the evidence in the light most favorable to the State. The main point of contention between the parties on this issue is the fact that the defendant was not present at the property when the burglary occurred and whether that would prevent him from forming a "reasonable belief" that the use of deadly force was necessary to prevent the burglary. The argument put forth by the State is that because the defendant would have no knowledge that the burglary was being committed, he could not form a reasonable belief as to what, if any, level of force was necessary to stop it. It is the State's position that the presence of the individual using the deadly force would be required for him or her to be able to observe the circumstances surrounding the burglary in real-time and determine whether deadly force is necessary. The defendant argues that no such presence or immediacy requirement is contained withing the language of the statute, and therefore, there is no such requirement. The defendant argues that the facts known and in existence prior to the burglary could rise to a level that would lead to a reasonable belief that deadly force was necessary.

¶ 69    There is no current case law within the State of Illinois that has specifically interpreted that an element of the presence of the individual using force or an immediacy of danger was intended by the legislature. However, this court finds that no such element needs to be inferred or read into

21

the statute as it is apparent that the "reasonable belief" requirement can encompass and consider these facts, just as it would any other facts of a case.

¶ 70 Here, it is undisputed that the defendant was not present when Mr. Spicer was killed. Thus, any belief that he formed as to whether deadly force was necessary could not have been formed at the actual time of the burglary but, instead, had to have been formed or existed at the time he set up the spring gun. According to the defendant's own statements, he had not lived at the property in over a year and a half. He also stated in his September 20, 2018, interview that "I haven't even attempted to open [the shed] in a year." According to Roger Ellet, the defendant set up the gun in either late February or early March of 2018, approximately seven months before Mr. Spicer was killed. At that time, based upon the statements made by the defendant in his interview with detectives, he had experienced some instances of theft at his property. In particular, he described the following:

> "[A]nd the locks was cut off my shed and everything was gone and they had a few things left just piled up out in the yard and I was like they are going to be back I'm going to catch whoever this is and I just hung out there. And when I saw it was Bill [Chapman] it just broke my heart."

He then told investigators that he had taken steps to stop the stealing, putting up a table in the driveway and putting up no trespassing signs. After he caught Bill Chapman stealing, he put razor blades on the shed door and dug a deep hole in front of the shed. It is unclear from the evidence whether any thefts occurred following these installments, and if so, at what point they may have occurred. It also is unclear whether any thefts occurred after the razor blades and hole in front of the door were installed. There was no evidence that the defendant attempted to install an alarm system, security cameras, motion detection lights, or any other non-lethal means which individuals regularly take to protect their property. What is clear is that the defendant asked the jurors at trial

22

to find that it was reasonable for the defendant to believe that the only option he had to prevent a possible burglary of his shed, sometime in the future, was for him to construct an illegal spring gun trap using a shotgun that would kill or maim anyone who entered. The jury declined to find that this belief was reasonable, and we decline to substitute our judgment for that of the jury.

¶ 71    Further, a rational jury could have concluded that the defendant was not acting in defense of his property at all. As mentioned above, the defendant did not take traditional steps to secure his property, like an alarm system, additional or reinforced locks, security cameras, motion detection lighting, etc. Instead, following the thefts from his property, the defendant began to implement booby traps which would cause harm to an intruder, *i.e.*, razor blades and a hidden pit in front of the door. While being questioned, the defendant constantly denied that any property remained in the shed that was of any value to him. He told the detectives that "really there ain't nothing there to keep an eye on"; "there ain't nothing left there to steal"; "sure in the hell wasn't nothing down there worth somebody's life"; and "[t]here wasn't nothing down there to protect." These statements logically demonstrate that the defendant set up the spring gun to harm instead of protect. According to Roger Ellet, the defendant told him he set up the spring gun and that he wanted to kill Bill Chapman because "that son of a b*** been breaking into my house. And I'm going to kill that son of a b***." This motive for setting up the spring gun was reiterated by the detectives when they interviewed the defendant the second time on January 24, 2019, and stated that they believed the defendant set up the spring gun because the defendant wanted to "pepper Bill Chapman's a***, because he was stealing from you." The defendant responded to that allegation with, "I want to beat Bill Chapman's a***, but I have no desire to kill anyone." During his first interview with detectives, when the defendant was asked why he set up the razor blades and dug the hole in front of the shed door following the thefts from his property, he responded, "get a good laugh when they broke their ankles and sliced their hands."

¶ 72    In light of this evidence, a rational jury could have believed, just as the detectives believed, that the spring gun was set up with the intention of causing harm to Bill Chapman or other trespassers and not set up for the purpose of protecting the property contained in the shed, which the defendant himself stated on multiple occasions was essentially worthless.

¶ 73    Therefore, we find that there was sufficient evidence for a rational jury to find beyond a reasonable doubt that either the defendant did not have a reasonable belief that deadly force was necessary or that the defendant did not act in defense of property.

¶ 74                              B. The State's Improper Argument

¶ 75    The defendant argues that two errors occurred during closing arguments. The first is that the State improperly shifted the burden of proof by arguing that the defense had access to all the evidence that the State had and that the State diminished the defendant's affirmative defense by arguing that because the property in the shed was not very valuable, the affirmative defense was not applicable in this case.

¶ 76    "A defendant arguing that reversal of his conviction is warranted on the basis of improper closing argument faces a difficult burden." *People v. Holmon*, 2019 IL App (5th) 160207, ¶ 48 (citing *People v. Gutierrez*, 402 Ill. App. 3d 866, 895 (2010)). "[R]eversal is only warranted if the improper remarks were a material factor in the jury's verdict." *Id.* While it may be difficult to reverse a conviction based on improper closing argument, it is possible if the "improper arguments are prejudicial enough to undermine a defendant's substantial rights." *Id.* (citing *People v. Brooks*, 345 Ill. App. 3d 945, 953 (2004)). In closing argument, prosecutors are allowed wide latitude and may argue facts and reasonable inferences drawn from the evidence. *People v. Williams*, 192 Ill. 2d 548, 573 (2000). However, prosecutors are not allowed to "engage in argument that serves no purpose other [than] to inflame the passions of the jury." *Holmon*, 2019 IL App (5th) 160207, ¶ 51 (citing *People v. Nicholas*, 218 Ill. 2d 104, 121 (2005)). On appeal, a closing argument must be

viewed in its entirety, and the challenged remarks must be viewed in their context. *People v. Glasper*, 234 Ill. 2d 173, 204 (2009). Statements will not be held improper if they were provoked or invited by the defense counsel's argument. *Id.*

¶ 77    In this case, the defense counsel failed to object at trial to the prosecutorial statements made in rebuttal argument and challenged on appeal and further failed to raise this issue in his posttrial motions. Thus, the defendant has forfeited review of those claims unless we consider them under the plain-error doctrine. *People v. Whitfield*, 2018 IL App (4th) 150948, ¶ 44.

> "Under the Illinois plain-error doctrine, a reviewing court may consider a forfeited claim when:
>
> > '(1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence.' [Citation.]
>
> However, where no error occurs, there cannot be plain error. [Citation.] 'Evidentiary rulings are within the sound discretion of the trial court and will not be reversed unless the trial court has abused that discretion.' [Citation.] 'An abuse of discretion will be found only where the trial court's ruling is arbitrary, fanciful, unreasonable, or where no reasonable person would take the view adopted by the trial court.' [Citation.]" *People v. Theis*, 2011 IL App (2d) 091080, ¶ 30.

Here, the defendant only seeks review under the first prong of the plain-error doctrine.

¶ 78    First, we address the argument that the State shifted the burden of proof by arguing that the defense had access to all of the same evidence the State had. The defendant contends that the State

attempted to insinuate in its rebuttal closing argument that the defense had access to all the same DNA evidence as the State had, and thus, it should have put forth DNA evidence that showed the defendant's DNA was not on the objects tested. We disagree with the defendant's interpretation of the State's arguments.

¶ 79 As explained above, when reviewing statements made in closing arguments, we keep in mind that prosecutors are allowed wide latitude and may argue facts and reasonable inferences drawn from the evidence. *Williams*, 192 Ill. 2d at 573. Additionally, the closing argument must be viewed in its entirety, and the challenged remarks must be viewed in their context. *Glasper*, 234 Ill. 2d at 204.

¶ 80 Here, the State did not discuss or reference DNA evidence in its closing argument. Instead, the defendant raised the issue in his closing argument while arguing that the only evidence the State had put forth was Roger Ellet's testimony. Defense counsel argued the lack of DNA evidence further bolstered how weak the State's case was:

"You've got a total lack of any forensic evidence to connect [the defendant] to this device. *** They collect all this forensic evidence to try to get identification comparison that will help them match the shotgun or these eye screws or this rope or these shogun shells or this vise or this hasp, they're trying to match that up with [the defendant]; trying to get his prints off of it; trying to get his DNA off of it. So you know that [the defendant's] prints and DNA were not on that shotgun. *** [I]t's a reasonable inference to be drawn from the evidence that if his prints had been on that gun, you would know about it. If his DNA or prints had been on that rope, you would know about it. If his prints or DNA had been on that vise, you would know about it. That evidence wasn't presented? [*sic*] So I would ask you: what's the reasonable inference to be drawn from that?"

¶ 81 As a result of this argument, in rebuttal the State responded by stating,

"But this case is not at all only about Roger Ellet. Roger Ellet just kind of brings it all together. So what am I saying? Well, look, [the defense] can tell you about what evidence we don't have, and you didn't hear evidence that we don't have because I don't know how to present evidence we don't have. But the evidence that we do have I think is pretty compelling. And not for nothing, [the defense] has access to all the same evidence that the State has."

¶ 82    We first note that at no point did the State specifically argue that the defense had access to the *same DNA evidence* as it did. It simply stated that the State and the defense have access *to the same evidence*. And reading the sentence before it, it is evident that the State is arguing that when you take "the evidence that we do have" the State believes that evidence is "pretty compelling." It is clear that the State is attempting to respond to the defense's attack as to why they did not put forth any DNA evidence. In response, the State says that it will not comment on evidence that does not exist; it will leave that to the defense to attempt to address. Instead, it asks the jury to focus on the evidence that has been presented, which is sufficient for a conviction. Thus, we find no error where the State's argument did not shift the burden of proof.

¶ 83    In the defendant's reply brief, he raised an additional argument that the following statement by the State also was error:

"The DNA in the shed that [the defense counsel] suggested to you was not there, I would submit, he said, Why? Well, I guess if we're speculating, maybe he's wiped everything down. I don't know. Law enforcement said they expected to find it. It's not in there. I didn't know the ownership of the shed is in question."

¶ 84    Here, the State is directly responding to a question asked by the defense in his closing argument. The defendant complains that the State argued facts not in evidence by suggesting that "maybe he's wiped everything down." However, it is clear from the language of the State that he

27

is "speculating" and that it "doesn't know" that to be true. Instead, the State is not offering that as truth, but is highlighting for the jury that whether or not DNA evidence is presented, the ownership of the shed is not in question: the defendant has admitted to being the owner of the shed. Considering that the State has wide latitude in argument, especially when responding to arguments made by the defendant, we do not find that this was error.

¶ 85    Secondly, the defense argues that the State misstated the law or somehow misled the jury by arguing that the low value of the property in the shed either defeated the defendant's affirmative defense or rendered it unavailable to them in this matter. We also disagree.

¶ 86    Again, we reiterate that the prosecutor has wide latitude in making a closing argument and that the closing argument must be viewed in its entirety. The defense argues the State put forth the argument that "[the defendant] could not defend his property from [Mr. Spicer] committing burglary because there was nothing of value in the shed." This misrepresents the State's argument throughout the trial and closing arguments.

¶ 87    The State consistently challenged whether the defendant held a reasonable belief that deadly force was necessary to prevent a commission of burglary of the defendant's shed. A crucial aspect of this case was obviously the defendant's "reasonable belief." The State argued that the defendant did not reasonably believe that deadly force was necessary because he regularly stated throughout his questioning by detectives that he believed there was nothing on the property worth stealing or of value, in other words, there was nothing to protect (*i.e.*, "really there ain't nothing there to keep an eye on"; "there ain't nothing left there to steal"; "sure in the hell wasn't nothing down there worth somebody's life"; and "[t]here wasn't nothing down there to protect"). Therefore, it was necessary for the jury to consider whether when the defendant himself believed there was "nothing" on the property worth stealing, whether that same "nothing" could have resulted in the reasonable belief that he was justified in using deadly force to defend "nothing."

28

¶ 88    Therefore, the State's arguments regarding the value of the property were relevant to the defendant's motive and belief and it was not error for those arguments to be made. Further, the State properly quoted verbatim the language of the defense of property statute when discussing these arguments. Therefore, we do not believe the jurors could have confused the law on the matter, especially when the trial court reiterated on numerous occasions during the trial that it would be the sole provider of the law of the case following the closing arguments.

¶ 89                    C. Admission of Improper and Prejudicial Evidence

¶ 90    The defendant argues that the jury was presented with numerous pieces of improper evidence that deprived the defendant of an impartial and fair trial, including (1) during *voir dire*, the jury witnessed a group of people in the gallery wearing shirts expressing sympathy towards the alleged victim Mr. Spicer, (2) the State repeatedly emphasized the gory nature of Mr. Spicer's death, (3) the State and witnesses repeatedly referred to Mr. Spicer as the "victim," and (4) the State used highly inflammatory language to link the defendant to terrorists that harm and kill our soldiers abroad and by repeatedly emphasizing the potential danger to the police officers in this case.

¶ 91    Again, these alleged errors were not preserved and thus are forfeited; however, the defendant asks us to review them under the first prong of the plain-error doctrine.

¶ 92    Criminal defendants have a constitutional right to a fair and impartial jury trial. U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, §§ 2, 8; *People v. Blue*, 189 Ill. 2d 99, 138 (2000). As explained above, evidentiary rulings are reviewed for an abuse of discretion. *People v. Thingvold*, 145 Ill. 2d 441, 452-53 (1991). A threshold requirement for admissibility that every item of evidence must meet is relevance. *People v. Dabbs*, 239 Ill. 2d 277, 289 (2010). Relevance means "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Ill. R. Evid. 401

29

(eff. Jan. 1, 2011). This probability is assessed " 'in the light of logic, experience, and accepted assumption as to human behavior.' " *People v. Pike*, 2016 IL App (1st) 122626, ¶ 33 (quoting *People v. Patterson*, 192 Ill. 2d 93, 115 (2000)). Only relevant evidence is admissible. Ill. R. Evid. 402 (eff. Jan. 1, 2011). However, even relevant evidence must be excluded where its nature is so prejudicial and so likely to inflame the jurors' passions that its probativeness is outweighed. *People v. Gonzalez*, 142 Ill. 2d 481, 487-90 (1991); Ill. R. Evid. 403 (eff. Jan. 1, 2011).

¶ 93    The defendant first argues that he was deprived of a fair and impartial trial because individuals who came to observe the trial wore shirts which expressed a message of sympathy towards Mr. Spicer. We disagree.

¶ 94    The individuals complained of came into the courtroom during the questioning of the first two panels of potential jurors. After finishing the questioning as to those jurors, the trial court noted on the record that "present in the courtroom were several individuals who were wearing shirts that apparently were sympathetic to the alleged victim in this case. There was a message on the front and a potential message on the back." The trial court went on to note that after balancing the rights of the citizens and the rights of the defendant, it had decided that those individuals would not be allowed in the courtroom with that attire and that they could return only when wearing clothes that did not risk communicating potentially partisan messaging to the jurors. The trial court indicated this would be the case for the entirety of the trial proceedings. He then instructed the bailiffs as to his ruling and to prevent this from occurring again. The trial court and parties then finished *voir dire* and empaneled the jury.

¶ 95    Thus, this prejudice could only have impacted eight potential jurors, only three of whom were ultimately selected to serve on the jury. However, that is not determinative of this issue. At no point during this portion of proceedings did any parties object or complain of the potential sympathetic messages in the gallery. Instead, the trial court on its own volition acted proactively

to protect the integrity of the trial process and removed those individuals. Following the removal of the individuals, neither party attempted to strike any of the jurors for cause as a result of them being exposed to the messages.

¶ 96 Further, the defendant puts forth no case law or any authority to support its assertion that such an instance so drastically prejudices a defendant or leaves jurors vulnerable to impartiality as to require a new trial. Therefore, we find that the trial court properly handled the situation and this was not error, as this occurrence did not deprive the defendant of a fair and impartial trial.

¶ 97 Second, the defendant argues that the State repeatedly emphasized during trial "the gory nature of [Mr. Spicer's] death." We find this to be a mischaracterization of the State's actions.

¶ 98 The State, as well as the trial court, on multiple occasions throughout the trial warned jurors and the gallery that they may be exposed "fairly graphic photos." The State used the term "fairly graphic" to describe the photos throughout the trial. The State never used the term "gory." The State only made these statements in *voir dire* when determining which potential jurors to select and during the trial when the photos were used as a part of the State's case. The State did so to warn those in the gallery who might be sensitive to such images so they could leave the courtroom preventing any potential outbursts and so the jurors could mentally prepare themselves before viewing the images. We find no inappropriate conduct by the State in this regard and the defendant offers this court no case law or authority to demonstrate that the warning of jurors and the gallery of "fairly graphic photos" prejudices the defendant to such an extent as to deprive the defendant of fair and impartial trial. Additionally, we note that the defendant does not dispute that the photographs were properly admitted as evidence and relevant to the case. Thus, we find no error here.

¶ 99 Third, the defendant argues that the State improperly referred to Mr. Spicer as "victim." The defendant acknowledges that the State initially referred to Mr. Spicer as the "alleged victim,"

31

but claims as the trial progressed that on occasions the State began to use "victim" more frequently. Once again, the defendant offers little relevant case law and none directly on point. We find here, where the State used the term "alleged victim" often and occasionally used only "victim," likely out of habit, this was not error. The use of "victim" in this matter was not what this court deems excessive and certainly was not used solely throughout the trial. Further, the State in its closing arguments clarified its position when it stated that, "Am I telling you that [Mr. Spicer] was definitely not there to commit a burglary or a theft? No, ladies and gentlemen, I'm not." Further, the State never did argue at any point in the trial that the spring gun was set up with the intention of killing Mr. Spicer. Instead, it clearly argued that the spring gun was likely set up to kill Bill Chapman. Thus, we cannot find error here, where the use of the term was so intermittent over the four days of trial that it could not have deprived the defendant of fair and impartial trial.

¶ 100   Fourth, the defendant argued that the State used highly inflammatory language and attempted to link the defendant "to terrorists that harm and murder our soldiers abroad and by repeatedly emphasizing the potential danger to the police officers in this case." We disagree with the defendant's contention.

¶ 101   The defendant points not to something the State said but, instead, to a conversation during the defendant's second videotaped interview with Detective Hileman and Detective Liggett. In the video, Detective Liggett attempted to explain to the defendant how Mr. Spicer was killed by the spring gun. Detective Liggett used the analogy of an explosion to help illustrate what happened. He explained that the gun fired, and it contained bird shot so it ejected metal pellets. However, the force of the bird shot projectiles hit the shed door and broke loose an aluminum gusset. The fragments of that gusset then penetrated Mr. Spicer's arm and struck an artery causing him to bleed to death. After the defendant offered little response or indication of understanding, Detective Liggett attempted to further explain and acknowledged that the defendant was wearing a military

32

style jacket. He then asked the defendant if he knew what a claymore—a military style explosive device—was. Detective Liggett then explained that the spring gun acted similarly to a claymore or I.E.D. (improvised explosive device) that is used over in the wars in the Middle East and injures United States soldiers.

> "I see you wearing a military field jacket. Do you know what a claymore is, little piece of metal. *** And you know what, uh what's [ ] killing soldiers in the Middle East right now is there improvised explosive devices, uh, when they take just about whatever they've got laying around and packing it behind some kind of explosive and launches out like that. Uh. Same idea. This gun goes off. The projectiles inside there hit this aluminum gusset and drive that into this man's body. Caused him to bleed to death. Sound complicated?"

¶ 102    It is the defendant's contention that this conversation by Detective Liggett was an attempt by the State to inflame the jury by comparing the defendant to a terrorist attacking United States soldiers in the Middle East. We disagree. The defendant relies on several cases in which courts have found that a prosecutor referring to a witness as a solider, witnesses appearing in uniform, or comparisons of a crime to a warzone were improper. However, we do not find these cases to be instructive as to the facts at hand. We simply do not have the same prejudicial action in this matter. Here, the prosecutor did not even voice the argument complained of by the defendant; a witness did. Therefore, the defendant's argument appears to be that the State should have redacted this portion of the videotape. However, "[g]enerally, statements made by an investigating officer during an interview with the suspected defendant are admissible if they are necessary to demonstrate the effect of the statement on the defendant or to explain the defendant's response." *People v. Hardimon*, 2017 IL App (3d) 120772, ¶ 35; see *Theis*, 2011 IL App (2d) 091080, ¶ 33 (observing that, without the officers' statements in the video, the defendant's responses would have been nonsensical). "An officer's testimony or statement during a video recorded interrogation

33

is ultimately subject to relevancy requirements, as well as the familiar test weighing probative value versus prejudicial effect." *Hardimon*, 2017 IL App (3d) 120772, ¶ 35. Here, the statement from Detective Liggett clearly is not intended to be a comparison of the defendant to a terrorist. To the contrary, it appears to be a logical effort, given the defendant's attire at the time of the interview, from the detective to explain to the defendant the complicated manner that ultimately led to Mr. Spicer's death. This was not a usual gunshot death. Mr. Spicer was killed not by the projectiles of the gun itself, but by the shrapnel it created. There was no intent by Detective Liggett to compare the defendant to a terrorist, and no rational jury could have concluded that there was. Viewed in their appropriate context, Detective Liggett's remarks were not in any way improper.

¶ 103   Further, the defendant's contention that the State's reference to the two bomb squads responding to the scene somehow enhanced or emphasized the terrorist argument is without merit. The State had every right to discuss the response of the bomb squads and the danger to the officers because it was directly tied to its arguments that the defendant's attitude and cooperation changed once he learned that the spring gun had been triggered and he acted as if there was no more threat to officers or himself, despite the bomb squads not being finished clearing the scene. Therefore, we also find no error here.

¶ 104                     D. Ineffective Assistance of Counsel

¶ 105   A defendant is denied his constitutional right to the effective assistance of counsel where (1) counsel's performance fell below an objective standard of reasonableness and (2) the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 686-87 (1984). Failure to establish either prong is fatal to the claim. *Id.* at 687. "[A] meritorious ineffective assistance of counsel claim is a substantial impairment of a fundamental right that can be addressed by a reviewing court, even if the defendant failed to raise the issue in the trial court." *People v. Tayborn*, 2016 IL App (3d) 130594, ¶ 13. Ineffective assistance of counsel claims are reviewed

*de novo*. *Id.* ¶ 16. However, the burden is on the defendant to affirmatively prove prejudice. *Strickland*, 466 U.S. at 693.

¶ 106    In this appeal, the defendant raises three different claims of ineffective assistance of counsel. First, the defendant argues that he received ineffective assistance of counsel because defense counsel failed to preserve the claims contained within arguments in sections B and C above. However, because we have found there was no error or improper conduct, the defense counsel cannot be ineffective for failing to preserve those issues.

¶ 107    Second and third, the defendant argues that his counsel was ineffective for failing to file a motion to suppress prejudicial portions of Roger Ellet's videotaped interview and the defendant's three videotaped interviews. "Generally speaking, counsel's decision regarding whether or not to file a motion to suppress is 'a matter of trial strategy which will be accorded great deference.' " *People v. Dunbar*, 2018 IL App (3d) 150674, ¶ 51 (quoting *People v. Wilson*, 164 Ill. 2d 436, 454-55 (1994)). However, a court need not decide whether counsel's performance was deficient before analyzing whether the defendant was prejudiced. *People v. Cortes*, 181 Ill. 2d 249, 295-96 (1998). "Establishing prejudice under the *Strickland* inquiry requires a defendant to 'show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " *People v. Barrow*, 195 Ill. 2d 506, 520 (2001) (quoting *Strickland*, 466 U.S. at 694).

¶ 108    Here, the State provided testimony that in late February or early March of 2018, the defendant and Roger Ellet travelled together to the defendant's property in Mr. Ellet's truck. After Mr. Ellet had loaded his truck with the things the defendant asked him to load, Mr. Ellet inquired as to what the defendant had been doing while he loaded the truck. The defendant then stated that he had set up a spring gun in the shed to "scare Bill Chapman" and that he wanted to kill Bill Chapman because "that son of a b*** been breaking into my house. And I'm going to kill that son

35

of a b***." There was undisputed evidence that the defendant was both the property owner, the shed owner, and the owner of the gun used in the spring gun setup which killed Mr. Spicer. On the day of the discovery of Mr. Spicer's body, the defendant came to the scene of the crime. Prior to the discovery of the spring gun, the defendant offered the police officers and investigators a key that supposedly went to the shed. However, that key did not work. Detective Hileman testified that another key that might unlock the shed was also on the key ring, but the defendant did not hand that one over, telling the officers it went to his buddy's shed. Following the discovery of the spring gun, and that the shotgun had fired and resulted in the death of Mr. Spicer, the defendant was called back to the scene. He was informed of what was discovered, and even though the bomb squads were still clearing the scene, he offered to go into the shed. Detective Hileman testified that the defendant acted as if he knew no other threats existed on the property. The evidence was undisputed that the spring gun resulted in the death of Mr. Spicer. During his videotaped questioning by Detectives Hileman and Liggett, the defendant admitted that he had used locks initially on his shed door and that those were cut off by thieves. He then admitted he put razor blades on the door and a dug a hole in front of the door to injure anyone who tried to enter. The defendant stated that he did this after he discovered Bill Chapman stealing from him. Mr. Ellet testified that the rope used in the spring gun was the same rope that he and Mr. Sumner were using to tie down things being moved. Mr. Ellet testified that this rope would have been in his truck on the day he and the defendant went to the defendant's property and that it was discovered missing later. Mr. Ellet testified that he told other individuals about the spring gun at the defendant's property prior to him knowing, or it being public knowledge, that Mr. Spicer was killed by a spring gun. Detective Hileman testified that he was able to corroborate with those individuals Mr. Ellet's testimony. Also, at trial, Mr. Ellet's wife and his brother-in-law testified that Mr. Ellet told them about the defendant setting up the spring gun. The defendant texted Detective Hileman inaccurate

information in an attempt to prove that he could not have had possession of his shotgun on the day he and Mr. Ellet went to his property. Additionally, once the detectives went to arrest the defendant, he evaded police for 12 hours before turning himself in. Finally, the defendant repeatedly told detectives, that "really there ain't nothing there to keep an eye on," "there ain't nothing left there to steal," "sure in the hell wasn't nothing down there worth somebody's life," and "[t]here wasn't nothing down there to protect," which addressed whether the defendant reasonably believed it was necessary to use deadly force to protect the property in the shed.

¶ 109   We do note that the defense counsel chose to play Roger Ellet's videotaped interview in order to highlight differences between Mr. Ellet's testimony at trial and his statements made to Detectives Hileman and Liggett when he was initially questioned. However, we do not believe these inconsistencies would rise to a level, especially in light of all the other evidence, to result in a different verdict even if the other crimes evidence was redacted out of the videotaped interviews.

¶ 110   Therefore, we find that, given the State's evidence and testimony the defendant has failed to show there is a reasonable probability that, but for any potential errors by defense counsel, the result of the proceedings would have been different. Because the defendant cannot show he was prejudiced by his defense counsel's actions, we do not need to consider whether those actions or inactions constituted deficient performance.

¶ 111             E. Failure to Admonish the Defendant of Right to Testify

¶ 112   Finally, the defendant contends that the trial court failed to admonish him of his fundamental right to testify in his own defense at trial and asserts that his waiver of this right was not properly recorded on the record. He asks this court to grant him a new trial as relief. However, the defendant concedes, as the Illinois Supreme Court has clearly stated, "a trial court has no duty to advise a defendant, represented by counsel, of his right to testify, nor is the court required to

ensure that an on-the-record waiver has occurred." *People v. Smith*, 176 Ill. 2d 217, 234 (1997). In fact,

> "Illinois courts have consistently found *** that when a defendant contends on appeal that he was precluded from testifying at trial, his conviction cannot be reversed on the basis that he was prevented from exercising that right unless he contemporaneously asserted his right to testify by informing the trial court that he wished to do so." *Id.*

Additionally, "a vast majority of the states considering this question have held that a defendant's waiver of his right to testify is presumed if, as in the present case, he fails to testify or notify the court of his desire to do so." *Id.*

¶ 113    Thus, while the defendant concedes there was no affirmative duty for the trial court to admonish the defendant of his right to testify or to put that admonishment on the record under current Illinois law, the defendant asks this court to depart from that precedent and create a new requirement. We decline to do so. We do acknowledge, as argued by the defendant, that there exists a line of Illinois case law following *People v. Smith*, which urged trial courts to

> "take the few seconds needed, after the State has rested its case in chief and before the presentation of the defense case, to admonish the defendant personally that he alone possesses the right to choose whether to testify on his own behalf, and that he should make that decision after consulting with counsel." *People v. Frieberg*, 305 Ill. App. 3d 840, 852 (1999); see also *People v. Burns*, 2019 IL App (4th) 170018, ¶ 24.

While we agree with these courts that admonishing the defendant and placing it on the record is the best practice, those decisions do not create a duty for the trial court requiring it to do so, and we decline to create any such duty.

¶ 114    Further, the defendant's additional argument that a duty has already been created—and his reliance upon *People v. Whiting*, 365 Ill. App. 3d 402 (2006), to support that proposition—is

38

misplaced. In *Whiting*, the court found that the defendant had attempted to assert her right to testify during the trial proceedings because there

> "were repeated uncontroverted statements and references by defendant at the motion hearing regarding her desire to testify on her own behalf, along with her testimony that her trial counsel told her she could not testify, and that she did not believe she, personally as a layperson, could raise the issue with the court at trial." *Id.* at 407.

Those facts are starkly different from the present case, where the trial court alerted the defendant to his right to testify during his first appearance by stating, "You would have the right to testify on your own behalf if you chose to do so after talking with your attorney and after being advised fully by the Court on that issue," and then, after that statement, the defendant never indicated to the court his desire to testify, never alleged he was denied the right to testify by his counsel, and never raised any concerns or made any inquires as to his opportunity to offer his testimony.

¶ 115 Thus, we find that there was no error where the trial court had no duty to admonish the defendant of his right to testify.

¶ 116                                        III. CONCLUSION

¶ 117 For the foregoing reasons, we affirm the defendant's convictions and sentences.

¶ 118 Affirmed.

*People v. Wasmund*, 2022 IL App (5th) 190525

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Union County, No. 19-CF-39; the Hon. Stephen R. Green, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Ellen J. Curry, and Eun Sun Nam, of State Appellate Defender's Office, of Mt. Vernon, for appellant. |
| **Attorneys for Appellee:** | Patrick Delfino, Patrick D. Daly, and Max C. Miller, of State's Attorneys Appellate Prosecutor's Office, for the People. |