THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
JEAN DeSAVIEU, Defendant-Appellant.

First District (5th Division) No. 81—2694

Opinion filed December 9, 1983.—Rehearing denied January 11, 1984.

Steven Clark and Bradley Bridge, both of State Appellate Defender's Office, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat and James J. Bigoness, Assistant State's Attorneys, of counsel), for the People.

JUSTICE SULLIVAN delivered the opinion of the court:

Following a jury trial, defendant was convicted of murder and sentenced to a term of 40 years. On appeal, he contends that (1) the trial court should have instructed the jury, *sua sponte*, on voluntary manslaughter; (2) his conviction should be reduced to voluntary manslaughter; (3) he was denied his right to a fair and impartial jury when the court refused to ask the supplemental questions he submitted for *voir dire* examination; (4) he was deprived of his rights to be present at all stages of trial and to effectively communicate with counsel when he was prevented from seeing the juror cards; (5) he was denied his sixth amendment right to confront witnesses against him when he was prevented from (a) cross-examining a crucial State witness regarding his prior conviction and current use of drugs and (b) impeaching that witness with evidence of a motive to testify falsely; (6) prosecutorial mis-

conduct before the grand jury deprived him of due process; (7) he was denied a fair trial as a result of the prosecutor's (a) introduction of irrelevant and prejudicial evidence concerning decedent's family and occupation, (b) improper references to decedent as "the victim" and (c) repeated misstatements of law; and (8) the trial court's refusal to consider his claim of self-defense as a factor in mitigation resulted in an excessive sentence.

Robert Dean, a long-time friend of both decedent and defendant, testified that after leaving a bar he and defendant walked to the 35th Street "L" station. While they were waiting for a train, Raymond Johnson joined them and an argument ensued between defendant and Johnson during which the two men grabbed each other and began to wrestle. In the struggle, defendant was pushed by Johnson and fell onto the train tracks where, without engaging in further discussion, he drew a pistol and fired at Johnson, who was standing about 10 feet from the edge of the platform. As Johnson fell backward, defendant jumped onto the platform and fired two more shots at him. Johnson then tried to tackle defendant and he was shot again, after which defendant left the station. Approximately 45 seconds later, a train arrived. Dean admitted that prior to making a statement to the police he had a conversation with decedent's brother, John Johnson, a county law enforcement officer, but denied that he was threatened or that he had testified at the grand jury hearing because of any such threat. Dean also denied that decedent had prevented defendant from getting up from the tracks or that defendant had asked whether Johnson was serious about threatening to keep him (defendant) on the tracks.

Douglas Grier testified that while waiting for a train at the 35th Street "L" station, he saw defendant and decedent "tussling." In the struggle, defendant was knocked off the platform onto the tracks, where he drew a gun and fired at Johnson who was standing a few feet from the edge of the platform trying to talk to defendant. After hearing a shot and a "click," Grier saw Johnson spin around and fall down. Defendant then climbed on the platform, walked toward Johnson, and kicked him. After the two men resumed "tussling," Grier heard two more shots and saw Johnson fall again. As defendant left the station, a train arrived. Grier stated that defendant fired slightly upward from his position on the tracks and that Johnson was standing at least two, but not 10, feet from the edge of the platform.

Dr. Mitra Kalelkar testified that Johnson sustained two gunshot wounds, either of which could have been fatal. One bullet entered decedent's lower abdomen and the other entered the back of his neck; each coursed slightly downward. Dr. Kalelkar noted that decedent also had a

small abrasion on his forehead. The doctor stated that a downward abdominal wound would not be caused by a bullet fired upward from a distance of three to four feet if the victim was standing upright, but that it was possible that decedent was stooped over when he was shot in the abdomen and that any hard part of his clothing, such as a pants zipper, could affect the course of the bullet. In any event, she could not exactly state from the wounds the position Johnson had been standing in at the time he was shot in the abdomen.

Officer Petak testified that on June 12, 1980, at the police station, Dean said he knew who had shot Raymond Johnson and that, upon Dean's request, he (Petak) called decedent's brother John because Dean said he feared defendant and would say nothing else until John was present.

Defendant, who had previously been convicted of armed robbery, aggravated battery, and attempted armed robbery, testified that after leaving a bar where he drank only one-half a glass of beer, he went to the 35th Street "L" station. He met Dean there and, as they waited for a train, Johnson approached and asked him (defendant) to buy a dance ticket. When he refused, Johnson—who appeared drunk—began to call him names. As he started to walk away, Johnson grabbed him, pushed him against a partition, and punched him. He slipped and fell with his back toward Johnson, who then hit him in the side of the face and pushed him onto the train tracks. Johnson then assumed a wrestler's stance, crouching over with his hands extended, less than one foot from the edge of the platform. He (defendant) looked down the tracks and saw a train approaching. He told Johnson that a train was coming, and Johnson replied, "I'm a fireman. I save lives. It's about time I take one." Defendant then asked Dean, who was nearby on the platform, whether Johnson was serious, and Dean replied, "Serious as cancer." He drew his gun and asked Johnson to back up because the train was coming. When Johnson would not move, he fired at him but the gun misfired. He fired a second shot, and Johnson stumbled backward but did not fall down. He then placed the gun in his coat pocket and climbed back onto the platform and, when Johnson lunged at him, he struck him with the gun. Johnson lunged once more, and he fired the gun again attempting to shoot Johnson in the buttocks but the bullet struck him in the back of the neck. Johnson continued to struggle, and he shot him once more—after which, with Dean's assistance, he propped Johnson up near the pillar. The train then arrived and he left the station, boarded a bus, and went home. Defendant stated also that while on the tracks he was in fear for his life because after Johnson refused to allow him back on the platform he saw the lights of an on-

coming train and realized that the electrified third rail and the traffic-filled Dan Ryan Expressway were behind him.

After his arrest five days later, defendant made a statement to an assistant State's Attorney. Later, at the station, Dean told him (defendant) that John Johnson, Officer Petak, and other police officers "got him in the police station and told him things he was going to have to say, or that he would be charged."

Defendant admitted that he disassembled his gun and threw it in Lake Michigan; that he knew the trains would stop at every station at that time of night; and that at the time of his arrest he told Officer Petak that he knew nothing about the killing, but that subsequently he told Petak what had occurred. In rebuttal, Petak testified that defendant had not mentioned seeing the lights of an oncoming train or that, after firing the first shot at Johnson, he put the gun into his coat pocket.

OPINION

We first consider defendant's contention that the trial court erred by failing to instruct the jury, *sua sponte*, on voluntary manslaughter. The jury was instructed as to self-defense; and defendant concedes that against the advice of his counsel, he expressly directed him not to tender a manslaughter instruction and that he signed a waiver form to that effect. However, he now argues that the court should have submitted that instruction on its own initiative, over his objections. We disagree.

■ We believe that *People v. Taylor* (1967), 36 Ill. 2d 483, 224 N.E.2d 266, is dispositive of this issue. There, it was held that the trial court's failure to give a manslaughter instruction where none was tendered cannot be asserted as a ground for reversal on review. The court stated, "it was not the duty of the [trial] court to submit issues and questions to the jury which the parties, by their action, said they did not desire passed upon." (36 Ill. 2d 483, 488, 224 N.E.2d 266, 269.) In *People v. Lewis* (1981), 97 Ill. App. 3d 982, 423 N.E.2d 1157, relying on *Taylor*, we made the same ruling, and we also noted that the decision by counsel as to whether a manslaughter instruction should be submitted is a tactical one involving various strategy considerations which would militate against imposing a duty to instruct the jury *sua sponte*.

■ Turning then to defendant's further argument that the trial court failed to determine whether his waiver was knowingly and intelligently made, we note that the trial court was informed by defendant's counsel that he had prepared a manslaughter instruction but that

defendant refused to allow him to tender it. Additionally, it appears that counsel presented a waiver signed by defendant to that effect. Defendant does not deny that he told his counsel not to present the instruction nor does he deny that he signed the waiver. We believe, under these circumstances, that there was a knowing and intelligent waiver by defendant.

■ Defendant alternatively contends that his conviction should be reduced from murder to voluntary manslaughter, maintaining that the evidence shows, at most, that the killing was the result of either a mutual struggle or his unreasonable belief that self-defense was necessary. However, it appears to us that there was ample evidence to support the murder conviction. Defendant testified that after he climbed back onto the platform, Johnson lunged at him and attempted to throw him back onto the tracks; that Johnson was stronger and larger; and that it was in the course of his attempt to repel Johnson's attack that he shot him again. However, the testimony of other witnesses is contradictory. Dean stated that defendant jumped back onto the platform and, with gun in hand, pursued and shot at Johnson who was behind a pillar, and Grier stated that Johnson had been disabled from the first shot and that it was defendant who then kicked him and renewed the struggle. Furthermore, defendant's claim that he was weakened by a recent illness is uncorroborated, and the evidence indicates that he and Johnson were close in size and weight. Moreover, defendant's assertion that he was in fear for his life because he saw an approaching train is overcome by testimony of Grier, that defendant did not look left or right as he stood on the tracks; of Dean, that defendant did not attempt to remount the platform before he shot Johnson; and of both Grier and Dean, that defendant had left the platform before the train arrived. The credibility of witnesses and the weight to be given their testimony is a matter for the trier of fact, and we will not substitute our judgment where there is evidence which supports their findings. *People v. Stringer* (1972), 52 Ill. 2d 564, 289 N.E.2d 631.

■ Defendant next contends that the trial court's refusal to ask the supplemental questions he had submitted for *voir dire* examination prevented him from ascertaining the potential biases and prejudices of prospective jurors. He argues that this was a denial of his constitutional right to an impartial jury which requires reversal of his conviction. We disagree.

It is well settled that although a litigant is entitled to a trial by an impartial jury (*People v. Jackson* (1977), 69 Ill. 2d 252, 371 N.E.2d 602, there is nothing in the constitutional guarantee of this right which prevents reasonable regulation of the manner in which jurors are selected

(*People v. Lobb* (1959), 17 Ill. 2d 287). The plain language of Supreme Court Rule 234 which governs *voir dire* examination provides, in pertinent part:

> "The court shall conduct the *voir dire* examination of prospective jurors by putting to them questions it thinks appropriate touching their qualifications to serve as jurors in the case on trial. The court *may permit* the parties to submit additional questions to it for further inquiry *if it thinks they are appropriate* * * *. Questions shall not directly or indirectly concern matters of law or instructions." (Emphasis added.) 87 Ill. 2d R. 234.

This rule was amended in 1975 to emphasize the duty of the court to manage the *voir dire* process (see Ill. Ann. Stat., ch. 110A, par. 234, Committee Comments, at 178 (Smith-Hurd 1981 Supp.)) and departs from the former rule which gave the parties the right to supplement the judge's examination (see Ill. Ann. Stat., ch. 110A, par. 234, Supplement to Historical & Practice Notes, at 178 (Smith-Hurd 1981 Supp.).) Thus, the decision concerning supplemental questions is within the discretion of the trial court (*People v. Barnes* (1982), 107 Ill. App. 3d 262, 437 N.E.2d 848), and so long as it exercises its power with reasonable regard for the rights of the accused, it fulfills the requirements of the law (*People v. Phillips* (1981), 99 Ill. App. 3d 362, 425 N.E.2d 1040). While there is no precise formula for determining whether a juror possesses the requisite impartiality, the standard for evaluating the court's exercise of discretion " '* * * is whether the means employed to test impartiality have created "a reasonable assurance that prejudice would be discovered, if present." ' " *People v. Washington* (1982), 104 Ill. App. 3d 386, 390, 432 N.E.2d 1020, 1024.

Here, defense counsel submitted 10 supplemental questions, eight of which probed the attitude of the jurors toward the concept of self-defense and their possible prejudice against defendant because of his prior convictions. The trial judge rejected these questions because they concerned matters of law about which the jury would be instructed, but he did ask a modified version of counsel's two remaining questions regarding potential bias against defendant if the evidence showed he was carrying a gun at the time of the homicide, and several jurors who expressed such prejudice were excused by the court. In addition, the jurors were asked numerous questions concerning their backgrounds, families, occupations, associations, and experiences, and whether they could be impartial and follow the law as instructed. Each juror was also given an opportunity to state any reason why he or she could not be fair.

It is our view that the court conducted a thorough *voir dire* exami-

nation which afforded defendant ample opportunity to discover any biases the jurors may have had, and that the court properly exercised its discretion in refusing to pose the specific supplemental questions submitted.

■ With respect to the jury selection process, defendant also contends that his constitutional right to be present at all stages of trial requires that he be able to effectively communicate with counsel, which he could not do because he was precluded from seeing the biographical juror cards. However, no request was made that he be shown the cards, but in a sidebar conference during *voir dire* examination, the prosecutor asked the court "whether you want the defendant to see the cards." Before any response was made, defense counsel said, "I wouldn't let him see the cards *** I never let the defendant see the cards." Thus, while the cards were made available to defendant's counsel, it appears that they were not shown to defendant solely because his counsel did not want him to see them. Such circumstances require us to reject defendant's contention.

■ Defendant also asserts that he was deprived of his sixth amendment right to confront witnesses against him by the restriction of his cross-examination of State's witness Dean regarding his past plea of guilty to possession of heroin and his current drug usage.

Although confrontation of witnesses through cross-examination is a matter of right (*People v. Pizzi* (1981), 94 Ill. App. 3d 415, 418 N.E.2d 1024), the latitude to be afforded in such examination is a matter largely within the discretion of the trial court (*People v. Vanda* (1982), 111 Ill. App. 3d 551, 444 N.E.2d 609), and, absent a clear abuse thereof resulting in manifest prejudice to defendant (*People v. Jones* (1979), 70 Ill. App. 3d 338, 387 N.E.2d 1010), the trial court's determination will not be disturbed on appeal (*People v. Brown* (1980), 91 Ill. App. 3d 582, 414 N.E.2d 1165).

When the State moved to exclude evidence of Dean's criminal background, the following exchange took place:

"DEFENSE COUNSEL: Since this is the first time I heard of it [Dean's guilty plea], I hadn't planned on putting it in my cross examination *** I will leave it to Your Honor's disgression [*sic*].

THE COURT: What do you have to say, if anything, relative to your being informed of this at this time?

DEFENSE COUNSEL: Well, the only thing I could say, Judge is that this is a little bit of a surprise but not a surprise that will hinder me in any great way in my cross-examination."

This colloquy establishes that defendant's attorney acknowledged the trial court's discretion and, without further discussion, acquiesced to

the court's subsequent ruling excluding the evidence. He thereby waived any error for purposes of review.

■ However, even assuming *arguendo* there was no waiver, we reject defendant's assertion that Dean's plea of guilty constituted a conviction under the standard set forth in *People v. Montgomery* (1971), 47 Ill. 2d 510, 268 N.E.2d 695, under which the credibility of a witness may be impeached by evidence of a prior conviction if the crime was punishable by imprisonment in excess of one year. At the time Dean pleaded guilty to possession of heroin, it was a Class 3 felony carrying a sentence of two to five years; but the court, *without entering judgment*, sentenced him to one year's probation under section 410(a) of the Controlled Substances Act (Ill. Rev. Stat. 1979, ch. 56½, par. 1410(a)). If a person so sentenced fulfills the terms and conditions of his probation, section 410(e) provides that "the court *shall discharge* the person and *dismiss* the proceedings against him." (Emphasis added.) Section 410(f) then states that "discharge and dismissal under this section is not a conviction for purposes of this Act or for purposes of disqualifications or disabilities imposed by law upon conviction of a crime."

Thus, under the provisions of section 410, no adjudication of guilt is made at the time probation is imposed. It is only in cases of failure to successfully fulfill the terms and conditions of probation that a conviction is entered.

In an analogous situation, our supreme court, interpreting section 10 of the Cannabis Control Act (Ill. Rev. Stat. 1979, ch. 56½, par. 710), which contains language nearly identical to that of section 410 of the Controlled Substances Act, stated in *People v. DuMontelle* (1978), 71 Ill. 2d 157, 163, 374 N.E.2d 205, 208, that "treatment under the first offender statute does not amount to a conviction ***. Any other conclusion is not only contrary to the inescapable statutory language but also emasculates the legislative intent to provide a unique and innovative punitive scheme for first offenders by excising their treatment from the general provisions of the Unified Code of Corrections ***." Therefore, it is our view here that the sentence of probation imposed under section 410(a) of the Controlled Substances Act is not a conviction and would not be unless the terms and conditions of the probation are violated.

Defendant, however, argues that the State had a duty to show that the terms and conditions of Dean's probation were not violated. However, we have consistently held that it is the party seeking to impeach who must show that there was a prior conviction. (*People v. Yost* (1980), 78 Ill. 2d 292, 399 N.E.2d 1283.) Here, because there was no

showing that a conviction was entered, cross-examination as to Dean's prior plea of guilty was properly excluded.

 With respect to defendant's assertion that the trial court erred in restricting cross-examination of Dean concerning his use of drugs, it appears that in a sidebar conference following the prosecutor's objection to the question, "[a]re you a narcotics user?" defense counsel conceded the impropriety of the question and thus waived any error for purposes of review. (*People v. Lamparter* (1977), 56 Ill. App. 3d 823, 371 N.E.2d 997.) However, defendant also argues that his counsel's failure to pursue this line of inquiry by substituting the word "addict" for the word "user" amounted to incompetence. We find this argument to be without merit. It is an elementary rule of trial procedure that for the purpose of impeachment, a witness may be examined concerning his drug addiction as affecting his credibility. (*People v. Dixon* (1961), 22 Ill. 2d 513, 177 N.E.2d 224.) However, where there is no evidence of addiction, the attempt to impeach a witness on that basis has been held to be "improper unless the examiner is prepared to make a showing to support the intended questions." (*People v. Brown* (1966), 76 Ill. App. 2d 362, 373, 222 N.E.2d 227, 232.) As stated in *People v. Irish* (1966), 77 Ill. App. 2d 67, 74-75, 222 N.E.2d 114, 117:

> "The cross-examiner may direct the attention of the witness to the time, place and substance of an alleged inconsistent statement and ask the witness if he made such a statement. This lays the foundation for subsequent impeachment. If the witness denies that he made such a statement, it is the duty of the defendant and his lawyer to produce evidence that the conflicting statement was actually made. It sometimes happens that such questions are asked solely for the purpose of sowing suspicion in the minds of the jurors. This is an impropriety, and the trial court should deal with it by admonishing the lawyer that he must not ask the question unless he has evidence to support its implications and by an instruction to the jury if so desired by counsel."

Here, the record establishes that the trial judge expressed his willingness to allow that question if defense counsel stated that he was prepared to present proof thereof if Dean denied addiction. Counsel then abandoned that line of questioning, and we conclude therefrom that no proof of Dean's addiction was available and that the court properly exercised its discretion in limiting this portion of the cross-examination. Defendant now maintains that counsel could have presented proof by asking Dean to roll up his sleeve. However, defendant was not entitled to such a physical examination of the witness, and in the ab-

sence of anything in the record to indicate what a view of the witness' arm would have revealed, we will not indulge in speculation on this point. See *People v. Conley* (1983), 118 Ill. App. 3d 122, 454 N.E.2d 1107.

■ Defendant further contends that he was improperly prevented from impeaching Dean with testimony concerning an alleged statement by him that he had been pressured by the decedent's brother, John Johnson, to testify against defendant. This contention, however, is contradicted by the record.

During direct examination of defendant, after the court sustained several of the prosecutor's objections concerning the substance of the conversation in which the alleged statement was made, the following colloquy occurred:

"DEFENSE COUNSEL: What else did Dean say to you?

DEFENDANT: Dean said they got him in the police station and told him things he was going to have to say, or that he would be charged.

PROSECUTOR: Objection.

DEFENSE COUNSEL: When you say they, John Johnson and others?

DEFENDANT: John Johnson, Officer Petak and other officers in the police station. May I continue?

DEFENSE COUNSEL: No. I have no further questions at this time."

Thus, the record reveals not only that the court made no ruling on the prosecutor's objection but also, contrary to defendant's contention, that the substance of the conversation was presented to the jury in his answer.

■ Defendant also maintains that he was denied due process by prosecutorial misconduct during the grand jury hearing. In a pretrial motion to dismiss, defendant asserted that during the grand jury proceedings the prosecutor allowed the introduction of "perjured or deceptive" testimony by Officer Petak that he (defendant) had admitted shooting Johnson, and he argues that he was denied due process when the prosecutor did not disclose the remainder of his post-arrest statement which explained that the shooting had occurred in self-defense.

After a hearing on the motion, the trial court found that Petak's statement was not perjurious because there was no question that defendant shot Johnson and, while Petak's testimony concerning the statement was not complete, it was given as a responsive answer to a specific question posed by a grand juror. There thus appears no misconduct that could be ascribed to the prosecutor. See *People v. Kline*

(1981), 99 Ill. App. 3d 540, 425 N.E.2d 562.

Furthermore, to support dismissal of a charge, prosecutorial misconduct before a grand jury must result in actual and substantial prejudice (*People v. Mack* (1982), 107 Ill. App. 3d 164, 437 N.E.2d 396), and the burden of proving such misconduct is on the defendant (*People v. Stanley* (1981), 95 Ill. App. 3d 910, 420 N.E.2d 727). Here, the trial court correctly noted that because Dean's testimony, as given, provided a sufficient basis from which the grand jury could infer that defendant acted in self-defense, he was not prejudiced by the State's failure to present the entire text of his statement to Petak.

■ Defendant also contends that he was denied a fair trial when the prosecutor introduced irrelevant and prejudicial evidence and made repeated misstatements of the law.

Defendant first maintains that the presentation of testimony concerning decedent's wife and son, the prosecutor's statement that Johnson was going home to his family when he was killed, the introduction of a family photograph, and references to decedent as "Firefighter Johnson" and "the victim" were calculated efforts to arouse the passions of the jury by reinforcing the image that defendant was responsible for breaking up a happy family and depriving society of a valuable citizen.

We initially see that defense counsel's failure to object to the majority of these alleged errors denied the court the opportunity to cure any harm resulting therefrom, and thus constituted a waiver of defendant's right to review. (*People v. Brown* (1982), 107 Ill. App. 3d 576, 437 N.E.2d 1240.) With respect to those allegations properly preserved for appeal, we note that while our supreme court has expressed disapproval of prosecutorial references to decedent's family and his standing in the community, which have no relevance to defendant's guilt or innocence (*People v. Wilson* (1972), 51 Ill. 2d 302, 281 N.E.2d 626; *People v. Bernette* (1964), 30 Ill. 2d 359, 197 N.E.2d 436), it has also held that such improper remarks do not necessarily entitle defendant to a new trial where the evidence is otherwise sufficient to support the conclusion that the errors did not contribute to the guilty verdict (*People v. Wilson*). Considering the totality of the evidence in this case, we cannot say that references to "the victim," his occupation, or family, although improper, were so inflammatory as to have affected the jury's ability to rationally evaluate the facts in issue.

■ Defendant additionally asserts that the prosecutor misstated the law on self-defense when he argued that shooting Johnson from the "L" tracks was not necessary because defendant failed to use available means of escape. He maintains that the prosecutor thereby misled the

jury into believing that the law obliges a person to attempt escape prior to using deadly force.

Although we agree that retreat or escape is not a requirement of the statute governing the use of force in self-defense (Ill. Rev. Stat. 1979, ch. 38, par. 7—1; *People v. McGraw* (1958), 13 Ill. 2d 249, 149 N.E.2d 100), we disagree with defendant's conclusion that the prosecutor misstated the law. In a murder trial, where an accused affirmatively raises self-defense and presents some evidence thereof, the State must then establish—along with all other elements of the offense—that the killing was not justified under the statute. (*People v. Aguero* (1980), 87 Ill. App. 3d 358, 408 N.E.2d 1092.) One requirement of section 7—1 is that the degree of force used must be "necessary to prevent imminent death or great bodily harm." It appears that the prosecutor's arguments were directed toward the factual issue of whether, in the light of defendant's options, which included climbing up a nearby ladder or taking shelter under the platform edge, it was necessary to shoot Johnson in order to remove himself from the path of an oncoming train.

■■ Defendant also contends that the prosecutor improperly argued that "one shot is self-defense, two shots, murder." While it is true that the mere fact that multiple shots were fired does not negate a claim of self-defense (*People v. Chapman* (1977), 49 Ill. App. 3d 553, 364 N.E.2d 577), the issue presented is whether, as defendant argues, Johnson was the aggressor after the first shot was fired. Even where the victim was initially the aggressor, use of deadly force is not justified where he has been disarmed or disabled. (*People v. Limas* (1977), 45 Ill. App. 3d 643, 359 N.E.2d 1194.) Here, although defendant testified that the second shot was fired in the course of a continuing struggle throughout which Johnson was the aggressor, witnesses Dean and Grier both testified that defendant was the aggressor when, after wounding Johnson, he climbed back onto the platform in pursuit of the decedent who had already retreated to the pillars in the middle of the platform. Thus, the question was not whether, as a matter of law, multiple shots negate self-defense, but whether, under the facts, multiple shots were necessary for his self-defense. The State may argue its theory of the case so long as its comments are supported by the evidence (*People v. Smith* (1982), 111 Ill. App. 3d 895, 444 N.E.2d 801), after which it is the function of the jury as triers of fact to decide whether the evidence is sufficient to establish that defendant acted in self-defense (*People v. Fields* (1978), 65 Ill. App. 3d 278, 382 N.E.2d 337). Since the testimony of Dean and Grier supports the prosecutor's argument, the statement complained of was not improper.

■■ Finally, defendant contends that the trial court's refusal to

consider his claim of self-defense as a factor in mitigation resulted in the imposition of an excessive sentence.

It is well settled that "the standard of review of a sentence claimed to be excessive is whether in fact the trial court exercised its discretion and, if so, whether this discretion was abused." (*People v. Cox* (1980), 82 Ill. 2d 268, 275, 412 N.E.2d 541, 545.) Our supreme court also stated, in *People v. Perruquet* (1977), 68 Ill. 2d 149, 368 N.E.2d 882, that the sentencing judge, having presided over the entire trial, is normally in a better position to determine the appropriate punishment than is a court of review, and that a reasoned judgment depends upon many factors including defendant's credibility, demeanor, general moral character, past criminal record, and potential for rehabilitation.

Defendant argues, however, that the trial court erroneously believed that because a voluntary manslaughter instruction had not been tendered, he was precluded from considering evidence of a mutual quarrel or defendant's belief that he was acting in self-defense. However, at the sentencing hearing, defendant was allowed to make a lengthy statement on his own behalf, after which the trial court discussed the jury's verdict and explained the bases of his sentencing decision. In reviewing the evidence, he specifically commented that the killing occurred "without any justification or cause" despite defendant's assertions to the contrary. He also evaluated defendant's demeanor, character, and "track record for violence" in determining that "a long sentence is necessary to serve the ends of justice in this case." We conclude therefrom that the court thoughtfully and properly considered the relevant factors in mitigation, as well as those in aggravation, prior to imposing sentence, and thus we find no abuse of discretion requiring a reduction of sentence.

For the foregoing reasons, the judgment is affirmed.

Affirmed.

WILSON, P.J., and LORENZ, J., concur.