NOTICE
Decision filed 11/14/25. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2025 IL App (5th) 230725-U

NO. 5-23-0725

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Madison County. |
| | ) | |
| v. | ) | No. 13-CF-2077 |
| | ) | |
| JERRY D. SUTT, | ) | Honorable |
| | ) | Kyle A. Napp, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE BARBERIS delivered the judgment of the court.
Justices Cates and Boie concurred in the judgment.

**ORDER**

¶ 1    *Held*: We affirm the trial court's denial of defendant's posttrial motion, where defendant was not deprived a fair and impartial trial by the trial court's denial of his motion *in limine*, which allowed the court, the State, and four State's witnesses to intermittently refer to the complaining witnesses as a victim or victims.

¶ 2    Following a jury trial in the circuit court of Madison County, defendant, Jerry D. Sutt, was found guilty of two counts of aggravated criminal sexual assault (counts I and II) (720 ILCS 5/11-1.30(a)(1) (West 2012)) and two counts of aggravated unlawful restraint (counts III and IV) (*id.* § 10-3.1(a)). The trial court sentenced defendant to a total of 80 years' imprisonment. Defendant appeals, arguing that the trial court committed structural error and that posttrial counsel rendered ineffective assistance of counsel. For the following reasons, we affirm.

1

¶ 3                    I. BACKGROUND

¶ 4     We limit our recitation to those facts relevant to our disposition of this appeal. We will

recite additional facts in the analysis section as needed to address defendant's specific arguments.

¶ 5     On October 24, 2013, the State charged defendant by superseding indictment with two

counts of aggravated criminal sexual assault (*id.* § 11-1.30(a)(1)), both Class X felonies, alleging

that on September 18, 2013, defendant, threatening to use a firearm, committed a criminal sexual

assault against B.M., a female minor, in that defendant, by the use of force, placed his penis in

B.M.'s mouth (count I) and his finger in the sex organ of B.M. (count II). The State also charged

defendant with two counts of aggravated unlawful restraint (*id.* § 10-3.1(a)), both Class 3 felonies,

alleging that defendant knowingly and without legal authority, and while using a deadly weapon,

detained B.M. (count III) and S.P., a minor male (count IV), by restraining both minors' wrists

and ankles with rope and duct tape. A grand jury subsequently returned a bill of indictment

charging defendant with the same four counts.

¶ 6     On October 1, 2014, defense counsel filed a motion *in limine* to prohibit the State and its

witnesses from referring to B.M., the "complaining witness[,] as the 'victim' because the status of

the complainant is a matter for the jury's determination and referring to her as a 'victim'

impermissibly and needlessly invades the province of the jury, to the Defendant's prejudice."[1]

¶ 7     On December 5, 2014, the trial court held a hearing on defendant's motion *in limine*.

Defense counsel argued the following:

> "MR. BOCK [(DEFENSE COUNSEL)]: Judge, we just believe that the term
>
> 'victim' would be conclusory and ask this Court to keep them from using the term 'victim'
>
> as [a] conclusion of law when that is for the jury to decide.

---

[1]Defendant's motion *in limine* only referred to B.M., not S.P.

We do not know at this time if that's going to be something the jury can decide. We would also say that—start using the term 'victim' at the beginning that may be just used to persuade the passions of the jury and just ask that at this time we talk about the subject in question or the subject's name, however they want to do that, but we would ask that the victim, that term is too prejudicial in the conclusion of fact that is proper for the jury to decide in this case."

In response, the State argued that "absolutely no case law, statutes, nothing" supported defendant's motion *in limine* to bar the State from referring to B.M. as a victim. The State asserted that B.M., "the girl, the child in question here is a victim of a crime. There is nothing to negate that. There is nothing that changes that." The State further argued that it had "no intentions of depersonalizing [B.M.] by calling her a victim throughout the entire trial, but to bar [the State] from using the term 'victim' is absurd." Following argument, the trial court denied defendant's motion *in limine*, stating: "I am unaware of any law or any case law that says *** that the term 'victim' is prejudicial or somehow impassions, you know, inflames the passions of the jury or makes them have prejudice for or against anyone." The court continued to state:

"I have seen counter Motions filed similar[ly] by the defense asking for Defendant not to be called 'the Defendant' because that also has some negative impact. It is a court of law, and there are certain terms that are used throughout, and in this particular case 'victim' is one of those terms. It is used often by medical personnel to describe someone when they are—when a nurse is talking about the person that she spoke to. So in this particular instance the Court is denying this Motion."

3

¶ 8    On July 18, 2016, defendant's three-day jury trial commenced. Defendant proceeded *pro se* at trial.[2] During *voir dire*, the trial court read the charges against defendant, at which time, the court separately referred to B.M. as "the name of the victim in this case," and S.P. as "the named victim in Count 4." The court later inquired of three groups of prospective jurors, stating the following question: "Does anyone know the victims or anyone from the victim's family?" In addition, the State referred to B.M. and S.P. on two occasions during *voir dire* as the "two victims in this case" prior to the court impaneling the jury. Following *voir dire*, the following evidence was adduced.

¶ 9    Kimberly McQuay, defendant's former paramour, testified that she shared a biological child, K.B.M.,[3] a seven-year-old daughter, with defendant. In August 2013, Kimberly sought and obtained an order of protection against defendant for herself and three children, K.B.M., B.M., Kimberly's 15-year-old daughter, and S.P., Kimberly's 16-year-old son. Kimberly's order of protection against defendant alleged that defendant had engaged in increasing violence and constant conflict in the home. On September 12, 2013, the trial court modified the order of protection, removing K.B.M. from the list of protected persons and allowing defendant visitation with her. Kimberly testified that she received a text message from defendant on September 18, 2013, sometime between 9 and 9:30 p.m., stating: "You are going to hurt more than you have ever hurt before." At that time, Kimberly and K.B.M. were in bed together on the first floor, while B.M.

---

[2]From May 2014 to June 2016, countless appointed defense attorneys filed motions to withdraw as defendant's counsel. On April 26, 2016, the trial court held a hearing on defendant's appointed public defender's motion to withdraw. The court inquired, and defendant agreed, that he wished to represent himself *pro se* to trial. Following the court's Illinois Rule 401 admonishments, the court concluded that defendant understood his rights. Defendant subsequently requested Attorney Dylan Jerrell represent him. On June 27, 2016, the court allowed Attorney Jerrell to represent defendant on the issue of fitness only before the court allowed Attorney Jerrell to withdraw as counsel, following defendant's request to proceed *pro se* to trial.

[3]The report of proceedings referred to K.B.M. as Bella throughout.

and S.P. were in their separate bedrooms located in the basement. Between 11:15 p.m. and 11:30 p.m., B.M. and S.P. woke up Kimberly, explaining to her that defendant tied them up and threatened them with a gun, knife, and pliers. Both B.M. and S.P. were scared, and Kimberly testified that B.M., while hysterically crying and clinging to Kimberly's arm, told her that defendant raped her. After police arrived, Kimberly and her three children went to the hospital to have B.M. examined.

¶ 10    Next, S.P. testified that he considered defendant a friend on September 18, 2013. Despite the order of protection, defendant and S.P. met up to see each other during that time. On September 18, 2013, defendant contacted S.P. to meet up. When S.P. subsequently met defendant that evening behind Kimberly's house, defendant carried a bag and stated that he wanted to come inside the home. When S.P. and defendant walked inside the house through the basement entrance, S.P. "turned around and [defendant] was just dumping out a bag of tie wire and a gun and rope." While holding the gun, defendant instructed S.P. to listen to him, informing S.P. that he would tie up both S.P. and B.M. Defendant then instructed S.P. and B.M. to lay down in the "living room part of the downstairs," at which time, defendant separately hog-tied both S.P. and B.M., with their hands and feet bound together behind their backs.

¶ 11    Defendant then moved S.P. into B.M.'s room on B.M.'s bed and placed a pillowcase over his head. S.P. testified that defendant instructed him not to move or he would "have to kill somebody," while informing S.P. that defendant was watching him on camera. S.P. laid on top of B.M.'s bed by himself for the next three hours before B.M. entered her bedroom to untie S.P. S.P. testified that B.M. was "[r]eally upset" at that time. Defendant then continued to wave his gun, pointing it at the children and himself, while threatening to kill them if they told anyone about the events of the evening. Defendant eventually left the house, and S.P. ran after him to ask what

happened. Defendant instructed S.P. to "go talk to [B.M.]." S.P. then talked to B.M. before waking up his mother to inform her that defendant hurt B.M. On cross-examination, S.P. testified that defendant duct taped his and B.M.'s mouths, and S.P. had ligature marks on his wrists and ankles from the tie wire. Defendant asked S.P. who tied up the children, and S.P. stated: "You."

¶ 12     Next, B.M. testified to the following. B.M. felt happy when the trial court issued an order of protection against defendant, stating that defendant "caused a lot of issues in [her] home." Prior to the incident at issue, defendant never physically harmed B.M. On September 18, 2013, B.M. returned home around 9 p.m. from a date with her boyfriend. She recalled getting ready for bed when S.P. and defendant walked into her bedroom around 9:40 p.m. She testified that she felt caught off guard because defendant was not allowed in the home and near her family. Defendant, who held rope, duct tape, and a gun in his hands, instructed B.M. to get on the ground, at which time defendant hog-tied her feet and hands together and placed duct tape over her mouth. B.M. also saw defendant hog-tie S.P.'s feet and hands together.

¶ 13     After defendant walked S.P. to B.M.'s bedroom, defendant carried B.M. to the basement living room area. B.M. testified that she wore a black t-shirt, bra, underwear, and pajama shorts at that time. Defendant placed B.M. in front of the couch and told her that they were "going to suck and fuck." Defendant had his gun and a pair of scissors with him that he placed on B.M.'s throat. Defendant lifted up B.M.'s shirt, cut off her bra with the scissors, removed her underwear and pajama shorts, and forced his penis into her mouth. While his penis was in her mouth, defendant told B.M. that "[she] deserved everything that was happening to [her] and that if [she] made it out of this alive, [she] would treat people better." When B.M. cried, defendant hit her on the back of her legs. Defendant also grabbed B.M.'s breasts with his hands, put his mouth on her breasts and vagina, and tried to put his fingers in her vagina. Although B.M. informed defendant that she was

6

on her period, defendant stated that he "didn't care" before he pulled out her tampon. Defendant then "positioned himself in front of [B.M.], tried to put his penis inside of [her]" vagina, and ejaculated on her vagina and the carpet. Defendant subsequently carried B.M. into a room next to her bedroom that she called her "dressing room." Still naked, defendant positioned her on her stomach, while defendant sat next to her. At that time, B.M. could see defendant's glasses and a cup from a gas station on the floor. According to B.M., defendant said "vulgar things" to her and stated that he planned to wait for Kimberly's friends to come to the house in the morning to "kill them." B.M. confirmed that she never put back on her black t-shirt, bra, underwear, and pajama shorts following the incident.

¶ 14   At some point, B.M. talked defendant into untying her by convincing him that she wanted to help defendant live in the house again and see his biological daughter, K.B.M. Defendant agreed, and B.M. and defendant untied S.P. For the next 30 minutes, S.P. and B.M. sat on the floor with defendant, at which time, defendant alternated between expressing remorse and requesting B.M. to shoot him, as well as expressing anger and stating that he wanted to go upstairs to kill K.B.M. and himself. Eventually, defendant agreed to leave. He packed his gun, scissors, rope, and duct tape in his duffel bag and left through the basement door. Defendant, however, left his glasses and cup in the basement in B.M.'s dressing room. After defendant left, B.M. told S.P. that defendant raped her. Upset from the news, S.P. ran outside after defendant. After S.P. returned from outside, they informed their mother what happened, and Kimberly called the police. B.M. subsequently showed police her cut bra, defendant's glasses and cup, and the "little bit of semen on the carpet." Shortly thereafter, B.M. went to the hospital, where a rape kit was performed and photos taken of the marks on her wrists and feet from the rope and duct tape.

¶ 15    The State's additional testimony corroborated B.M. and S.P.'s accounts of September 18, 2013. Sergeant Andrew Friedrich of the Madison County sheriff's office testified that S.P. and B.M. showed police B.M.'s cut bra on the floor, a plastic cup of "what appeared to be soda," a spot on the carpet that "looked moist to the naked eye," and "a pair of glasses laying on the floor *** near the cut bra and the cup." In addition, Lieutenant Carole Presson of the Madison County sheriff's office testified that she collected the sexual assault rape kit and photographs taken of B.M.'s wrists and feet at the hospital. Lieutenant Presson testified that the photographs, which showed injuries to B.M.'s wrists and feet, were consistent with B.M.'s version of events. Moreover, Forensic Biologist Brian Hapack with the Illinois State Police Metro East Forensic Science Lab testified that DNA samples were taken from the carpet area and straw of the cup that B.M. showed police following the incident with defendant. Hapack testified that he also analyzed B.M.'s sexual assault kit, confirming the presence of semen in the swab samples taken from B.M.'s labia majora, vaginal opening, and anal area. Hapack testified that he extracted DNA from the labia majora and anal swabs of B.M. that "matched the DNA profile that [he] determined from the standard of Jerry Sutt" that Hapack received from the Madison County sheriff's office. Hapack confirmed that the analysis of the swabs extracted from B.M.'s sexual assault kit contained only one male profile that matched defendant's profile. Hapack also swabbed the "end portion of the straw" from the cup police obtained in B.M.'s dressing room, which matched defendant's DNA profile. Moreover, Hapack identified the presence of semen on the section of moist carpet identified by police, which revealed a male's DNA profile that matched defendant's DNA profile.

¶ 16    Next, the State called Detective Brian Koberna. Detective Koberna testified that he monitored recorded calls that defendant took in the Madison County jail in October 2013. Specifically, on October 9, 2013, at 5:31 p.m., defendant and his stepson, Michael Hayden, whom

defendant called Pete, spoke on the phone. The State then played a portion of the call where defendant stated the following to his stepson on the recorded call: "Peter, I went there to kill every motherfucker."

¶ 17    Lastly, defendant testified on his own behalf. Defendant testified that he went to Kimberly's house on September 18, 2013, to explain to S.P. that he had not fixed S.P.'s "Ninja motorcycle." According to defendant, S.P. met him around back and let him into the house through S.P.'s bedroom. S.P. went to B.M.'s room, while defendant went to the garage to get a "stater [*sic*]," an unloaded gun for his trip to Madison, Wisconsin, and some tools. While in the garage, defendant heard a noise, prompting him to wait quietly in the garage for 20 minutes to avoid Kimberly. Once the noise stopped, defendant entered the home and walked near B.M.'s dressing room. At that time, B.M. ran out of her room and past defendant wearing "some kind of negligee." According to defendant, S.P. walked out of B.M.'s room looking at defendant in a "sexually excited" way. Defendant testified that, although he did not see anything sexual, he believed S.P. and B.M. could have engaged in sexual activity together. After B.M. and S.P. ran upstairs, defendant laid on the couch for the next 30 minutes, watched a sex show, and masturbated, "pleasuring [himself] with [B.M.'s] black shorts." Defendant testified that B.M. walked downstairs, saw defendant, and questioned him, prompting defendant to "quickly throw the shorts" and "put [his] penis as quickly away as [he] c[ould]." Defendant then grabbed his bag with his "tools" and went to S.P.'s room. According to defendant, he caught B.M. and S.P. "playing grab ass," which "wasn't the first time." After defendant left the house, S.P. ran outside after defendant to inquire about his Ninja motorcycle. While outside, defendant questioned S.P. "about how many times *** [defendant] yelled at [S.P.] to get out of the bathroom while [his] sister was taking a shower." Defendant testified that he previously gave B.M. a fake WD40 bottle to put drugs in.

9

According to defendant, he sporadically spied on her by checking the bottle. Defendant testified that B.M.'s wounds looked "more like sandal straps," and, according to him, she did not have marks on the back of her legs.

¶ 18    On cross-examination, defendant admitted that the glasses and cup belonged to him. He confirmed S.P.'s version of events, specifically, that S.P. met defendant at the fence and the two walked into the basement together. Defendant confirmed that an active order of protection existed at the time he decided to sit in the basement and masturbate. Defendant confirmed that he was in the home "just hanging out" for two hours. To explain how B.M. had semen inside of her, defendant stated: "The only way that I can even come close to justifying that is when I masturbated on her shorts." Defendant confirmed that B.M. testified that she never put her shorts back on following the incident. Defendant denied both B.M. and S.P.'s version of events. Defendant admitted that he told his stepson during a jail call that he "went *** to [that] house to kill every mother fucker" to get his stepson's attention. Defendant admitted that he saw a friend, Richard Stanton, several days after the incident, at which time, he told Stanton he was in trouble and gave Stanton's wife his gun. Defendant admitted that his name "was all over the news," so he left Illinois to go to his sister's home to find legal assistance. Following all testimony and evidence, the jury subsequently found defendant guilty on all counts.

¶ 19    On August 10, 2016, defendant filed a *pro se* "Motion for Newly Discovered Evidence to be Heard," requesting the trial court hold an emergency hearing concerning newly discovered evidence. Defendant's motion requested Attorney Dylan Jerrell present as a witness and to serve as legal assistance "if need be." The court subsequently provided defendant a subpoena for Attorney Jerrell but ruled that Attorney Jerrell could not legally assist defendant.

¶ 20    On August 24, 2016, the trial court denied defendant's *pro se* motion and also sentenced defendant to 40 years in prison on count I with consecutive sentences of 35 years in prison on count II, to be served at 85% followed by mandatory supervised release (MSR) of 3 years up to natural life. In addition, the court sentenced defendant to five years in prison for each count III and count IV, followed by one year of MSR on each count, to run concurrent with each other but consecutively with counts I and II.

¶ 21    Defendant filed a timely notice of appeal. This court vacated the trial court's order denying defendant's posttrial motion and remanded the cause for new posttrial proceedings, including the determination of whether defendant desired the assistance of counsel and, if so, for the court to appoint counsel. See *People v. Sutt*, No. 5-16-0369 (2020) (unpublished summary order under Illinois Supreme Court Rule 23(c)). This court issued its mandate on May 5, 2020.

¶ 22    On September 2, 2021, the trial court held a hearing on defendant's posttrial motion. At that time, defendant requested, and the court appointed, posttrial counsel to represent defendant.

¶ 23    On December 2, 2022, defendant filed a *pro se* "Motion for Appearance Before This Honorable Court." In his motion before the trial court, defendant alleged that posttrial counsel, Attorney Kerri Davis, rendered ineffective assistance by failing to allow defendant's involvement in his case and claiming that he and Attorney Davis could not resolve important issues together. As such, defendant requested the court allow him "the opportunity to express his issues and concerns" before the court.

¶ 24    On February 1, 2023, defendant filed *pro se* correspondence with the trial court, requesting the court appoint "special counsel from another county" seeing that Attorney Davis "quit per her saying such." Subsequently, on March 15, 2023, the court held a hearing on defendant's correspondence. At the hearing, Attorney Davis informed the court that she did not quit but was

"absolutely" still representing defendant. Defendant indicated that he did not want to fire Attorney Davis. The court subsequently denied defendant's motion requesting special counsel. Defendant then proceeded to make allegations against Attorney Davis, requesting a *Krankel* hearing. *People v. Krankel*, 102 Ill. 2d 181 (1984). The court was prepared to hold a preliminary *Krankel* inquiry that day; however, defendant indicated on the record that he was not prepared.

¶ 25 On June 29, 2023, the trial court held a preliminary *Krankel* inquiry hearing. During the hearing, defendant presented argument concerning Attorney Davis's alleged ineffectiveness, and Attorney Davis responded in detail to defendant's allegations. At the conclusion of the hearing, the court determined that defendant's allegations did not amount to ineffective assistance of counsel and declined to appoint defendant new posttrial counsel. Defendant subsequently filed a *pro se* motion to reconsider, which the court denied.

¶ 26 On August 9, 2023, Attorney Davis filed defendant's posttrial motion requesting that the trial court vacate his convictions and sentences and grant defendant a new trial. In his motion, defendant alleged, *inter alia*, that the trial court erred by denying defendant's motion *in limine* to prohibit the term "victim" at trial, arguing that the status of a complaining witness is a factual issue within the province of the jury to decide.

¶ 27 On August 30, 2023, the trial court held a hearing on defendant's posttrial motion. From the outset, Attorney Davis noted that the "exhaustive" posttrial motion stood for itself. Specific to the issue on appeal, the State argued that defendant's motion *in limine* prohibiting the term "victim" at trial was "exhaustively litigated." The court, in addressing this specific motion *in limine*, stated that no case law stated that a victim could not be called a victim at trial. The court continued to state:

12

"It's like calling the State the State. Technically they're the People of the State of Illinois, but they get called the State all the time or sometimes they get called the government. That's just part of what we do. Defendant[ ]s get called defendants. Sometimes they get called Mr. Sutt. That's just what they are. Sometimes I get called judge. Sometimes I get called ma'am. It's just the title that's given.

And calling a victim a victim particularly in a case where these were children who were the victims in this case. Children who were sexually assaulted. Children who were hog tied in their living room. Children. So I suppose the Court could have allowed Mr. Sutt or the State to refer to them as children. I don't know that that would have been any better than the word victim. So I don't believe that was error to do that."

The court subsequently denied defendant's posttrial motion, and defendant filed a timely notice of appeal.

¶ 28                                    II. ANALYSIS

¶ 29    Defendant argues on appeal that the trial court erred by denying defendant's motion *in limine* and by referring to B.M. and S.P. as victims during *voir dire*. Defendant also asserts that the trial court's errors, combined with the State's "frequent use" of the words victim or victims to describe B.M. and S.P., amounted to structural error. Lastly, defendant argues posttrial counsel rendered ineffective assistance. We address defendant's contentions in turn.

¶ 30    We first address defendant's argument that the trial court should have granted his motion *in limine* and prohibited the State and its witnesses from referring to B.M. and S.P. as victims. We note that although defendant did not object at trial to the use of the word victim by the trial court, the State, and the State's witnesses, defendant filed a motion *in limine* seeking an order excluding the use of this word when referring to B.M. and S.P. The court denied the motion *in limine*, and

13

defendant raised this issue in his posttrial motion. In a criminal case, "a defendant preserves an issue for review by (1) raising it in either a motion *in limine* or a contemporaneous trial objection, and (2) including it in the posttrial motion." *People v. Denson*, 2014 IL 116231, ¶ 11; *People v. Hudson*, 157 Ill. 2d 401, 434-35 (1993); *People v. Boclair*, 129 Ill. 2d 458, 476 (1989). Here, defendant preserved this claimed error for review by raising the issue in a motion *in limine* and again in his posttrial motion.

¶ 31    "A motion *in limine* is addressed to a court's inherent power to admit or exclude evidence." *People v. Zimmerman*, 2018 IL App (4th) 170695, ¶ 134. The purpose of such motions is to bring to the trial court's attention, prior to trial, evidence that is potentially irrelevant, inadmissible, or prejudicial, and to obtain in a pretrial ruling whether the evidence may be admitted or excluded. *Id.* We review a trial court's evidentiary rulings for an abuse of discretion. *People v. Becker*, 239 Ill. 2d 215, 234 (2010). A trial court abuses its discretion when a ruling is "arbitrary, fanciful, unreasonable, or when no reasonable person would adopt the trial court's view." *People v. Ward*, 2011 IL 108690, ¶ 21.

¶ 32    Defendant first asserts that the trial court erred by denying his motion *in limine*, which allowed the State "free license" to refer to B.M. and S.P. as "victims" throughout defendant's trial. Defendant specifically takes issue with the court's "derelict" statement, where it asserted that it was "unaware of any law or any case law" that supported defendant's argument "that the term 'victim' [wa]s prejudicial or somehow impassions, you know, inflames the passions of the jury or makes them have prejudice for or against anyone." To support his position, defendant cites to several out-of-state court cases and argues that an "abundance" of case law contradicts the trial court's statement. Although case law from state jurisdictions other than our own may be cited as persuasive authority, we are not bound to follow it. See *People v. Nelson*, 2021 IL App (1st)

14

181483, ¶ 36 (citing *In re Parentage of Scarlett Z.-D.*, 2015 IL 117904, ¶ 55 ("decisions from our sister state courts are not binding on the courts of this state")). Here, defendant offers no case law directly on point and explicitly acknowledges that no Illinois court has reversed a defendant's conviction and sentence where the State referred to the decedent or a complaining witness as a "victim." Despite this, defendant argues that "ample authority" in Illinois exists for the proposition that "under the right set of facts," the State's use of the word victim to describe a complainant "*can be unfairly prejudicial*," which would require reversal. (Emphasis in original.) As such, defendant requests this court find the trial court abused its discretion by denying his motion *in limine*. We decline to do so.

¶ 33    At the time the trial court denied defendant's motion *in limine*, this exact issue had been rejected by courts, or courts held that the usage of "victim" was not so prejudicial as to deny defendant a fair trial. For example, in *People v. DeSavieu*, 120 Ill. App. 3d 420, 432 (1983), the appellate court rejected the defendant's argument that the State's references to the decedent as "the victim," his occupation, and his family were a calculated effort to arouse the passions of the jury. Although the court determined that the State's references were improper, it concluded that such references were not "so inflammatory as to have affected the jury's ability to rationally evaluate the facts in issue." *Id.* The court also stated that such improper remarks did not necessarily entitle a defendant to a new trial, especially where the evidence was "otherwise sufficient to support the conclusion that the errors did not contribute to the guilty verdict." *Id.* (citing *People v. Wilson*, 51 Ill. 2d 302 (1972)).

¶ 34    Next, in *People v. Anderson*, 234 Ill. App. 3d 899, 909 (1992), the appellate court rejected the defendant's argument that the State usurped the jury's function as trier of fact by referring to the decedent as a "victim" in an effort to play on the sympathies and prejudices of the jury. In

15

rejecting the defendant's argument, the court noted that a "close reading of the record" showed that the State's use of the word victim "was easier than reciting decedent's name just as they used the term 'defendant.' " *Id.* The court further noted that any prejudice by the "alleged improper term" was cured when the court sustained the defense counsel's objections and admonished the State to use the decedent's name. *Id.*

¶ 35    Moreover, in *People v. Zernel*, 259 Ill. App. 3d 949, 956-57 (1994), the appellate court determined that the State's use of the term "victim" was a permissible reference to the person alleging to have been harmed in a sex offense and did not result in prejudicial error. In fact, the *Zernel* court similarly found that "no case law indicat[ed] that a prosecutor's use of the term 'victim' when referring to a complaining witness [wa]s prejudicial error." *Id.* at 957. In finding that no prejudicial error existed, the *Zernel* court also stated that "the statutory definition of 'victim,' as that term is used in conjunction with criminal sexual assault and other related crimes, states that 'victim' means 'a person *alleging* to have been subjected to an offense ***.' " (Emphasis in original.) *Id.* (citing Ill. Rev. Stat. 1991, ch. 38, ¶ 12-12(g) (repealed by Pub. Act 96-1551, art. 2, § 6 (eff. July 1, 2011))). As such, it appears that the *Zernel* court determined that the use of the word "victim" was acceptable when prosecuting a sex offense, including aggravated criminal sexual assault. *Id.* Accordingly, at the time that the trial court denied defendant's motion *in limine* in the instant case, prior Illinois courts had decided that, although the use of the word "victim" could be deemed improper, the usage of the word was not so prejudicial as to deny a defendant a fair trial.

¶ 36    Moreover, and importantly, the trial court's granting or denial of a motion *in limine* "is always subject to reconsideration during trial." *People v. Drum*, 321 Ill. App. 3d 1005, 1008 (2001). This is because the trial court "rules on it in a vacuum, before hearing the full evidence at

16

trial that may justify admission or require exclusion." *Cunningham v. Millers General Insurance Co.*, 227 Ill. App. 3d 201, 205 (1992). As such, we find it important to note that defendant could have objected at trial and argued that case law supported his position, allowing the court to reconsider its pretrial ruling. As stated above, defendant, proceeding *pro se*, did not object during trial. It is well established that where a defendant elects to proceed *pro se*, he is responsible for his representation and is held to the same standards as any attorney. *People v. Allen*, 401 Ill. App. 3d 840, 854 (2010) ("Defendant was admonished about the consequences of proceeding *pro se* and that he would be required to perform as an attorney would and the court could not provide any legal assistance to him."). Based on the foregoing, we simply cannot conclude that the trial court's decision to deny defendant's motion *in limine* was unreasonable or that no reasonable person would take the view adopted by the court, where the court determined that the usage of the word "victim" was similar to calling defendant " 'the Defendant,' " which the court reasoned were terms used as identification in a court of law and did not inherently imply guilt. Accordingly, we cannot conclude that the trial court abused its discretion.

¶ 37    Next, defendant argues that, as a result of the trial court's denial of his motion *in limine*, the collective prejudicial impact of the repeated use of "victim" and "victims" to describe B.M. and S.P. amounted to structural error. Specifically, defendant asserts that the use of these words by the trial court, the State, and the State's witnesses was so pervasive that it affected the framework of the trial itself, denying defendant a fair trial. We disagree.

¶ 38    From the outset, we note that the State seemingly agrees with defendant that this issue is preserved. Defendant argues that the jury's repeated exposure to the words "victim" and "victims" denied him a fair trial, constituting second-prong plain error. In defendant's reply brief, however, he specifically argues, again, that he is not invoking the structural error doctrine to advance an

17

argument under the plain error doctrine. Instead, he invokes the structural error doctrine directly. As such, we address defendant's argument concerning structural error only and not error based on the second prong of plain error.

¶ 39    Structural error is a unique designation granted "only in a 'very limited class of cases.' " (Internal quotation marks omitted.) *People v. Glasper*, 234 Ill. 2d 173, 198 (2009) (quoting *Neder v. United States*, 527 U.S. 1, 8 (1999)). An error is designated as structural only if it "necessarily render[s] a criminal trial fundamentally unfair or an unreliable vehicle for determining guilt or innocence." (Internal quotation marks omitted.) *Id.* at 196. The fact of the error alone requires "automatic reversal." *Neder*, 527 U.S. at 8. The structural errors identified by the Supreme Court include a complete denial of counsel, denial of self-representation at trial, trial before a biased judge, denial of a public trial, racial discrimination in the selection of a grand jury, and defective reasonable doubt instruction. *Washington v. Recuenco*, 548 U.S. 212, 218 n.2 (2006). These efforts affect the framework within the trial proceedings, meaning that "these errors deprive defendants of 'basic protections' without which 'a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence … and no criminal punishment may be regarded as fundamentally fair.' " *Neder*, 527 U.S. at 8-9 (quoting *Rose v. Clark*, 478 U.S. 570, 577-78 (1986)). Structural errors are not subject to harmless error review. *People v. Rivera*, 227 Ill. 2d 1, 19-20 (2007).

¶ 40    Defendant argues that the alleged errors in the instant case are of great magnitude and rise to the level of structural error as a result. Although the aforementioned Illinois cases cited by defendant imply a possibility that some set of circumstances could deem the use of the words "victim" or "victims" improper (*DeSavieu*, 120 Ill. App. 3d at 432; *Anderson*, 234 Ill. App. 3d at

18

909; and *Zernel*, 259 Ill. App. 3d at 956-57), we cannot conclude that such use in the instant case rendered defendant's trial fundamentally unfair.

¶ 41    First, a detailed review of the trial court's use of the words "victim" or "victims" three times during *voir dire* (*e.g.*, court referred to B.M. and S.P. each as named victims and also asked prospective jurors if "anyone kn[e]w the victims or anyone from the victim's family?") reveals the use did not constitute language "so inflammatory as to have affected the jury's ability to rationally evaluate the facts in issue" (*DeSavieu*, 120 Ill. App. 3d at 432). Rather, after stating the words "victim" and "victims," the court admonished and instructed the prospective jurors during *voir dire*, pursuant to Illinois Supreme Court Rule 431(b)(1) and (2) (eff. July 1, 2012) that defendant was presumed innocent of the charges against him and that the jury had to find defendant guilty beyond a reasonable doubt, which the State had the burden of proving. The court repeated six times that defendant was presumed innocent of the charges against him before the court asked the jurors if they understood and accepted the principles.

¶ 42    Moreover, we do not deem the use of the words "victim" or "victims" by the State and the State's witnesses as excessive or overly used in a way that invaded the province of the jury in deciding a key issue of fact. This court, well after defendant's trial, decided in *People v. Wasmund*, 2022 IL App (5th) 190525, ¶ 99, that the State's frequent use of the term "alleged victim" and intermittent use of the term "victim" to refer to the decedent during trial was not error. Importantly, this court highlighted that the defendant offered little relevant case law and none directly on point to support his position that the State's improper usage deprived him of a fair and impartial trial. *Id.* In reaching this conclusion, the court reasoned that the State's use of the word "victim" over the defendant's four-day trial was not excessive and not used solely throughout trial. *Id.*

19

¶ 43    Here, the record indicates that only 4 of the State's 12 witnesses, including Officer Friedrich (one time), Officer James Randolph (11 times), Lieutenant Presson (one time), and Detective Koberna (two times), referred to B.M. and S.P. as either a victim or victims over the course of defendant's three-day trial. A review of Officer Randolph's testimony reveals that he referred to

B.M. and S.P. as a victim or victims when explaining the investigation process, including what he and other officers collected, where in the house the collection of evidence took place, and what information about the alleged crimes he received from other officers when he arrived on scene. The State used the word victim or victims on six occasions when referring to B.M., including four times during the testimony of Officer Randolph—the State's second testifying witness. Similar to *Wasmund*, 2022 IL App (5th) 190525, ¶ 99, here, it appears the usage of the words "victim" or "victims" during Officer Randolph's testimony was likely out of habit, provided the State and other witnesses only occasionally used the words "victim" or "victims" over the course of the State's entire case-in-chief. In fact, the overwhelming majority of times the words "victim" or "victims" were stated took place during Officer Randolph's testimony at the beginning of defendant's trial. Based on a review of the entire report of proceedings, we reject defendant's contention that the court, the State, or the State's witnesses repeatedly used the words "victim" or "victims" throughout defendant's trial, such that the State "took full advantage" of the court's "free license" to refer to B.M. and S.P. as victims. Accordingly, we also reject defendant's argument that the court, the State, and State's witnesses vouched for B.M. and S.P. as credible witnesses by referring to B.M. and S.P. as victims.

¶ 44    Importantly, if the facts of the case demonstrated that the trial court's denial of the motion *in limine* resulted in defendant being tried before a biased jury, we would not hesitate to reverse

20

defendant's conviction. *Glasper*, 234 Ill. 2d at 200-01 (trial before a biased jury constitutes structural error). However, there are no such facts in the instant case, where there is no evidence that defendant was tried by a biased jury. We cannot presume the jury was biased simply because the words "victim" and "victims" were used infrequently throughout trial. Rather, as stated above, the court admonished and instructed the jurors several times that defendant was presumed innocent of the charges against him before the court asked the jurors if they understood and accepted the principles set forth in Rule 431(b). Accordingly, we find the use of the words "victim" and "victims"—which were not pervasively used throughout defendant's three-day trial—did not affect the fundamental fairness of defendant's trial in such a way as to place it in the same category as the limited structural errors designated by the Supreme Court. See *Recuenco*, 548 U.S. at 218 n.2.

¶ 45     Lastly, defendant argues that posttrial counsel denied him effective assistance of counsel by failing to develop and present argument that the trial court committed structural error when the court denied defendant's motion *in limine* and also described B.M. and S.P. as " 'victims' " during *voir dire*. We disagree.

¶ 46     Claims that counsel provided ineffective assistance of counsel are evaluated under the familiar two-part test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *People v. Poole*, 2012 IL App (4th) 101017, ¶ 8. To establish that counsel was ineffective, a defendant must show that (1) counsel's performance fell below an objective standard of reasonableness and (2) counsel's deficient performance prejudiced defendant. *People v. West*, 187 Ill. 2d 418, 432 (1999). Since both prongs of the *Strickland* test must be satisfied, a finding of ineffective assistance of counsel is precluded if a defendant fails to satisfy one of the prongs. *Poole*, 2012 IL App (4th) 101017, ¶ 8.

¶ 47 As to the deficiency prong, counsel's performance is measured against prevailing professional norms. *People v. Domagala*, 2013 IL 113688, ¶ 36. When determining whether counsel's performance was objectively unreasonable, a defendant must overcome a strong presumption that the challenged action, or inaction, was the product of sound trial strategy. *Poole*, 2012 IL App (4th) 101017, ¶ 10. Mistakes in trial strategy or judgment, by themselves, will not render the representation ineffective, as a defendant is entitled to competent, not perfect, representation. *People v. Tucker*, 2017 IL App (5th) 130576, ¶ 26. To meet the prejudice prong, defendant must demonstrate prejudice by showing a reasonable probability that, but for counsel's deficiencies, the result of the proceeding would have been different. *People v. Lucious*, 2016 IL App (1st) 141127, ¶ 45.

¶ 48 Here, defendant cannot show that a reasonable probability exists that the result of the posttrial hearing would have been different had posttrial counsel developed defendant's contentions in his posttrial motion and/or argued further at the hearing on his posttrial motion, where no binding authority supported defendant's position that the trial court abused its discretion by denying defendant's motion *in limine*, leading to reversible error. Thus, defendant's ineffective assistance of counsel claim also fails.

¶ 49 III. CONCLUSION

¶ 50 For the reasons stated, we affirm the judgment of the circuit court of Madison County denying defendant's posttrial motion.

¶ 51 Affirmed.